**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DARREL STEFFY AND** | : | |
| **SUSANNE STEFFY** | : | **Case No. 1:06-CV-02227** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| | : | |
| **THE HOME DEPOT, INC. AND** | : | |
| **PATRIOT TIMBER PRODUCTS** | : | |
| **INTERNATIONAL, INC.** | : | |

## MEMORANDUM

Before the Court are cross motions to exclude proposed expert testimony.  Plaintiffs Darrel and Susanne Steffy seek to exclude the reports and testimony of defense experts William Wheatley and E. Mitchell Swan.  (Doc. No. 49.)  Defendants Patriot Timber Products International, Inc. ("Patriot Timber") (Doc. Nos. 46, 48) and The Home Depot, Inc. ("Home Depot") (Doc. Nos. 58, 61)[1] seek to exclude the testimony of Edward Montz Jr. and Weinstein Realty Advisors.  The motions are fully briefed, the Court has heard testimony from the experts at the scheduled *Daubert* hearing, and the issues are ripe for disposition.  For the following reasons, the Defendants' motions will be granted in part and denied in part; the Plaintiffs' motion will also be granted in part and denied in part.

## I.  BACKGROUND

The dispute in this case arises from the sale of plywood to the Plaintiffs for construction of a multi-purpose building ("Building") on their property in 2004.  (Doc. No. 1.)  The structure was intended for use by family and employees of Steffy Concrete and would include a garage for

---

[1] Home Depot's motions to exclude are based on the same grounds and arguments as those asserted by Patriot Timber.  (Doc. Nos. 58, 61.)

storage of construction vehicles, a gymnasium, ceremonial hall, and offices.  (Id.)  During

construction of the Building, the Plaintiffs allege that they have purchased 400 sheets of

plywood from one of Defendant Home Depot's stores, used it to panel most of  the interior walls

in the Building.  (Id. 15-16; 20; 22.)  Thereafter, Plaintiffs claim that they experienced adverse

health effects after using the Building, and eventually a "pungent, unpleasant" odor was noticed

in the Building.  (Id. ¶ 30.)  After tests were performed, the Plaintiffs determined that the odor

was formaldehyde, which allegedly rendered the Building uninhabitable.  (Id. ¶ 53.)

## II.  STANDARD OF REVIEW

The Supreme Court has held that the trial court has "a special obligation" to ensure that

any and all expert testimony is not only relevant but reliable.  Kumho Tire Co., Ltd., v.

Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.,

509 U.S. 579, 589 (1993)).  This special obligation has been likened to a "gatekeeping role" for

the trial judge.  Daubert, 509 U.S. at 597.  Accordingly, the admission of scientific, technical, or

other specialized knowledge is within the discretion of district court.  General Elec. Co. v.

Joiner, 522 U.S. 136, 146-47 (1997).

This inquiry is controlled by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702.  As the Third Circuit has explained, these requirements represent the "trilogy

of restrictions on expert testimony: qualification, reliability and fit."  Calhoun v. Yamaha Motor

Corp. U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (citing Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).

When considering the qualification requirement, a Court must discern whether a proffered witness has specialized expertise in a given field.  Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).  In undertaking this inquiry, no particular background or credentials are necessary to establish specialized knowledge: "a broad range of knowledge, skills, and training qualify an expert."  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994).  There is no challenge to the qualifications of any of the proffered experts in the present motions, and the Court finds that each challenged expert satisfies the qualification requirement.

As for the reliability requirement, the Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S at 152.  To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable . . . [but] the evidentiary requirement of reliability is lower than the merits standard of correctness."  Pineda, 520 F.3d at 244.  When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from *Daubert*:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Calhoun, 350 F.3d at 321 (citing Paoli, 35 F.3d at 742 n.8).  These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  Kumho Tire, 526 U.S. at 150.  Accordingly, the Rule 702 inquiry is a flexible one, and the court should also take into account any other relevant factors.  Calhoun, 350 F.3d at 321.

The final requirement is fit, which means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  Id. (quoting Schneider, 320 F.3d at 405). "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  Daubert, 509 U.S. at 591-92.  This inquiry goes primarily to relevance because expert opinion which does not relate to a disputed issue is not relevant and cannot assist the trier of fact as required by Rule 702.  Id.  As the Supreme Court has explained,

> The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

Id.  Like the typical relevance inquiry, the standard for analyzing the fit of an expert's analysis to the case at hand is "not that high."  United States v. Ford, 481 F.3d 215, 219-20 (3d Cir. 2007) (quoting Paoli, 35 F.3d at 745).  But, expert testimony can be powerful and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that "district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of *Daubert*.  Id. at 219 n.6.

## III. DEFENDANTS' MOTIONS

**A.  Edward Montz Jr.**

    **1.  Report**

Edward Montz Jr.'s ("Montz") expert report deals with the formaldehyde concentrations in the Plaintiffs' Building.  (Doc. No. 46 Ex. C at 1 (hereinafter "Montz Report").)  Montz's report describes two stages of testing at the Plaintiffs' Building.  During the first stage, Montz tested the air in the Building and determined that the concentrations of formaldehyde "were far higher than any concentrations that we have observed in any newly constructed space, to date, as a result of construction materials alone."  (Id. at 6.)  The second study was "aimed at evaluating Mr. Steffy's concern about paneling containing formaldehyde."  (Id.)  IAS took two samples of plywood, which were comprised of five four-by-eight sheets taken randomly throughout the Building.  (Id. at 4.)  These samples were then sent to a lab where they were loaded into a chamber for emissions monitoring; a process called large chamber ASTM Method.  (Id.)  From these results, Montz estimated a concentration of formaldehyde in the plywood when it was initially purchased.  (Id. at 7-8.)

The Defendants challenge two of Montz's conclusions in this motion.  First, they challenge his conclusion that "[t]he chamber testing indicated that the 13-layer veneer plywood in the space was a potent source of formaldehyde."  (Id. at 7.)  In further elaboration of this opinion, Montz testified that he could conclude a substantial component of the formaldehyde in the Building's air was being offgassed by the plywood paneling.  (Daubert Hr'g. Tr. at 78: 19-23, Oct. 23, 2008 (hereinafter "Hr'g. Tr.").)  Defendants secondly challenge Montz's conclusion that the high concentrations of formaldehyde in the plywood "undoubtedly caused the elevated formaldehyde levels detected in the space."  (Montz Report at 7.)  This conclusion was clarified

somewhat at the hearing, where counsel represented that Montz's ultimate opinion was that "the plywood was a substantial contributing factor of high formaldehyde levels in the building . . . ." (Hr'g. Tr. at 98: 16-20.)

### 2. Discussion

The Defendants challenge Montz's methodology in reaching his conclusions that the panels are the source and cause of the formaldehyde because he fails to account for potential alternative causes of formaldehyde in the air.  (Doc. No. 54 at 19.)  Focusing on the reliability prong of the *Daubert* inquiry and relying on Roche v. Lincoln Property Co., 278 F. Supp. 2d 744 (E.D. Va. 2003), the Defendants argue that Montz could not reliably come to his conclusion without accounting for other potential sources of formaldehyde used in construction of the Building or obvious alternative causes of the formaldehyde saturation.

As the Plaintiffs point out, *Roche* is not binding on this Court, but the Third Circuit has approved of the proposition that a causation expert's failure to account for obvious alternative explanations can be considered as a factor in assessing the reliability of his conclusions.  See In re Unisys Savings Plan Litigation, 173 F.3d 145, 166 n.10 (3d Cir. 1999) (citing Claar v. Burlington N.R.R. Co., 29 F.3d 499, 502 (9th Cir. 1994)).

### a.  Source of the Formaldehyde Saturation

As to the first conclusion, the Court is satisfied that Montz's methodology is reliable.  In his testimony at the *Daubert* hearing, Montz sufficiently explained his reasoning in focusing on the plywood and having it tested first.  As discussed above, Montz's initial tests of the Building (which are not challenged by the Defendants) showed extremely high concentrations of formaldehyde in the air.  (Hr'g. Tr. at 72: 2-5.)  With these results in mind, Montz assessed the

"multiplicity of items in the building that could be a source." (Hr'g. Tr. at 76: 5-6.)

Recognizing that it would take a large source of formaldehyde to produce the concentrations

found in the air, Montz looked for materials in the Building that had large enough volume,

weight, and surface area to offgas the high levels formaldehyde, which led him to focus on the

plywood. (Hr'g. Tr. at 76: 8-11.) Given the data he had already examined, plywood was a

legitimate focus of his investigation, especially when taking into account reports that handling

the plywood had caused some ill effects. (Hr'g. Tr. at 76: 14-18.)

Further, Montz did consider other sources of formaldehyde in his analysis. In a letter

dated September 15, 2006, Montz stated:

> Other Sources of formaldehyde in the building have not been
> identified or tested. From a scientific perspective, I need to be certain
> that the paneling is the major problem in the building. Given the
> ubiquitous nature of formaldehyde in building materials, I do not
> want to be professionally embarrassed by discovering later that
> another source of formaldehyde was the problem in the building.

(Doc. No. 46-4 Ex. F at 2.) While the Defendants make much of this letter in attacking the

reliability of Montz's methodology, it shows that Montz had not simply overlooked the other

potential sources of formaldehyde in his investigation. In fact, Montz was evaluating the

potential for other significant sources right up until the chamber testing showed such high

concentrations of formaldehyde in the plywood. Further, he testified that in considering these

alternative potential sources of formaldehyde, he gathered Material Safety Data Sheets

("MSDS") for all of the products used in construction of the Building and contacted

manufacturers of those products to evaluate their potential impact. (Hr'g Tr. at 80: 12-18.)

Focusing on Montz's admission that he could not exactly correlate the tested plywood

outgassing rates with the formaldehyde concentration in the Building's air, Defendants argue

that "it is impossible to conclude that the formaldehyde in the plywood is the only source of formaldehyde in the air.  Such a conclusion is even more difficult to reach in the presence of multiple potential sources of formaldehyde, the formaldehyde content of which is unknown." (Doc. No. 54 at 20.)  But, as the Plaintiffs point out, this is not Montz's ultimate conclusion.  He opines only that a substantial component of the formaldehyde in the air was being offgassed by the plywood paneling, which reflects his understanding that other sources of formaldehyde were present in the Building and contributed to the overall formaldehyde levels.  Thus, while the fact that Montz did not perform actual tests on these other potential sources might affect the weight of his conclusion, it does not make his methodology unreliable.  The Defendants' concern is more appropriately addressed on cross-examination and by presentation of contrary evidence at trial.

Montz also admitted in his testimony that the plywood samples sent out for testing only represented less than one percent of the 700 plywood panels installed in the Building.  He also testified that "scientifically you would like to sample 10 percent or so of the total population."[2] (Hr'g Tr. at 90-91.)  His report provides that each of the two samples had a minimum surface area of 71 square feet, however, which he determined was adequate to satisfy the goal of "providing a reasonable estimate of the conditions present during IAS's two sampling periods." (Montz Report at 4, 8.)  While a more representative sample would have been preferable, given the other steps of Montz's analysis discussed above, the Court also does not find that testing this small sample size renders his methodology unreliable for the limited scope of his testing.  While this admission may affect the weight of his conclusions, it does not call into question the

---

[2]  Montz explained that the reason more plywood was not sampled was because the cost of such sampling would have been prohibitively expensive.  (Hr'g. Tr. at 90: 21-25.)

reliability of his methodology such that his opinion should be excluded.

Defendants also point out that in addition to failing to test alternative sources Montz failed to consider the design of the Building and ventilation when coming to his conclusions. (Doc. No. 46 at 11-12.)  As to Montz's first conclusion — that a substantial component of the formaldehyde in the air was being offgassed by the plywood paneling — the design of the Building and ventilation system are irrelevant.  The plywood can be the substantial source of the formaldehyde no matter how the Building was designed or ventilated.  Therefore, given the above discussion, the Court finds that Montz's methodology in reaching this first conclusion is reliable.

### b.  Cause of the Formaldehyde Saturation

Montz's second challenged conclusion — that the plywood was a substantial contributing factor of high formaldehyde levels in the Building — would necessarily involve consideration of more variables than simply determining the substantial *source* of the formaldehyde in the Building.  Despite Plaintiff's arguments, the Court cannot say that design of the Building and ventilation (among other concerns) are irrelevant variables in an expert's evaluation of causation in this circumstance.  The formaldehyde level in the atmosphere of a Building is not merely a function of the source of formaldehyde and its potency, though this factor is certainly a critical component of the inquiry.

Montz does not rely solely on the plywood's formaldehyde concentration when opining about the cause of the elevated formaldehyde levels in the Building, however.  His opinion takes into account environmental measurements and finds that they would not be expected to widely affect formaldehyde release rates.  (Montz Report at 7.)  He further acknowledges that the

formaldehyde concentrations in the air did not exactly correlate to the chamber release rates of

the plywood boards, but goes on to explain this finding does not undermine his conclusion that

the the plywood is the cause of the elevated levels:

> It should be noted that approximately 700 total pieces of plywood were installed in the space and our testing only involved a very small quantity of the total plywood.  When multiplied by 700, the formaldehyde release would be very significant.  This is true, despite the fact that the constructed spaces are relatively large spaces.  The net effect of the number of panels releasing formaldehyde, versus, the space, would suggest that the observations are consistent with the airborne levels in the space being higher than those liberated in the chamber over a one-week period . . . .

(Id.)  This explanation further shows that Montz considered other variables in coming to his

conclusion, including the overall characteristics of the Building, the volume of plywood, and

levels of the formaldehyde.  Further, Montz testified that, even though he did not take any

measurements of the HVAC system, he did consider the part played by the ventilation in the

Building.  (Hr'g. Tr. at 95: 10-14.)  Given the above, the Court cannot say that Montz's

methodology is unreliable simply because he did not focus more specifically on the Building's

design and HVAC system, as the Defendants would obviously prefer.  This determination is

bolstered by the fact that neither of the Defendants' challenged experts were even able to opine

that any level of ventilation would have adequately dissipated the excessive formaldehyde levels

in the Building.  (Hr'g. Tr. at 128: 7-14 (Swan); Hr'g Tr. at 142: 17-24 (Wheatley).)   In these

circumstances, the Court finds that Montz based his conclusion on an adequate foundation of

data and information.  Accordingly, because the Court also finds Montz's report otherwise

reliable, his testimony will not be excluded.

### B.  Weinstein Realty Advisors

### 1. **Report**

Elliot Weinstein ("Weinstein") is a real estate appraiser who offers an opinion on the value of the Building at issue in this litigation. (Doc. No. 48-4 Ex. B-1 (hereinafter "Weinstein Report").) Because the Building is only one part of a larger piece of property with several other buildings, Weinstein estimated the "contribution" of the Building to the value of the whole property. (Id. at 11.) To accomplish this objective, Weinstein utilized the "Sales Comparison Approach" and the "Cost Approach." (Id. at 46.)

The first step under the cost approach is to estimate the subject site's land value as if it were vacant. (Id.) This value is obtained by comparing the subject site with other similar sites that have been recently sold. (Id.) The subject improvements' replacement cost as new are then estimated using the Marshall Valuation Service and various sources of depreciation on those improvements are quantified and subtracted from replacement cost as new to give the "depreciated replacement cost." (Id.) Adding the depreciated replacement cost to the determined land value as vacant yields an estimate about the value of the subject property and contribution of the Building improvement. (Id.) For this property, Weinstein's final conclusion after valuing the land under the cost approach is that the market value of the entire property is $1,250,000 with the Building itself contributing $660,000 to the value. (Id. at 5.)

Under the sales comparison approach, Weinstein compares the "sales of similar properties as the basis of an indication of value for the subject property." (Id. at 46.) The comparison of properties may be made on any basis that is "recognized in the marketplace and provides an adequate unit of measure to indicate market value." (Id. at 47.) Weinstein's final conclusion after valuing this property under the sales comparison approach is that the market

value of the entire property was $1,150,000 with the Building itself contributing $610,000 to the value.  (Id. at 5.)

Based on the outcome of these two approaches, Weinstein concluded in his report after reconciling the slightly different outcomes that the market value for the entire Steffy property was $1,200,000 and that the contribution of the Building was $635,000.  (Id. at 5.)

### 2.  Discussion

The Defendants admit that "Weinstein has employed accepted models in their valuations."  (Doc. No. 55 at 6.)  Despite this, they contend that Weinstein's appraisal does not satisfy the "fit" requirement of Rule 702 because he has not applied the methods reliably to the facts of the case.  (Id. at 9.)

There is support for the proposition that an expert's testimony is not helpful to the jury and does not comply with the "fit" requirement of Rule 702 when the expert relies on assumptions in his methodology that do not have support in the record.  See e.g., Elcock v. Kmart Corp., 233 F.3d 734, 756 n.13 (3d Cir. 2000) ("[A] lost future earnings expert who renders an opinion about a plaintiff's future economic harm based on economic assumptions not present in the plaintiff's case cannot be said to assist the trier of fact as Rule 702 requires."); Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record.")

### a.  Highest and Best Use

The first challenged assumption that Weinstein makes relates to the highest and best use for the property as improved, which is an essential component in identifying comparable

properties for valuation.  (Weinstein Report at 44.)  Highest and Best use may be defined as "the

reasonably probable and legal use of vacant land or improved property" and is determined by

considering what is: (1) legally permissible, (2) physically possible, (3) financially feasible, and

(4) maximally profitable.  (Id. at 43.)  These criteria are to be considered by the appraiser "[i]n

sequential order, usually from the most general to the most specific, each criteria is considered in

turn, thereby eliminating at each level, proposed uses that do not qualify.  This process

stimulated [sic] the thought process of the rational and informed decision-maker and helps the

appraiser identify the most likely users and buyers for the subject property."  (Id.)  Weinstein

concludes that the highest and best use for the subject site is as "a non-impact home based

business."  (Weinstein Report at 3.)

The Court first notes that the subject property and Building's zoning classifications are

not at issue except to the extent that they were applicable to the assumptions in Weinstein's

appraisal.  There is no dispute that the subject property is located in zone C, or the conservation

zone under East Cocalico's zoning ordinance and that Steffy Concrete currently operates on the

property as a preexisting, nonconforming use.  (Weinstein Report at 44; Doc. No. 48-6, Ex. E at

36 (hereinafter "Jones Report").)[3]  East Cocalico's zoning ordinance defines a preexisting use as:

"[a] use, whether of land or of structure, which does not comply with the applicable use

provisions in the zoning ordinance or amendment heretofore or hereafter enacted, where such

use was lawfully in existence prior to the enactment of such ordinance . . . ."  East Cocalico, Pa.,

Official Zoning Ordinance, Section 112 (Dec. 8, 2003) *available at*

http://www.co.lancaster.pa.us/lanco/cwp/view.asp?A=707&Q=570545 (hereinafter "Zoning

---

[3]  The Court notes that the Defendants' real estate appraiser has not been challenged by the Plaintiffs on *Daubert* grounds.

Ordinance").

The dispute and confusion arises with regard to the permitted uses of the Building at issue, which was built on this property after the enactment of the current zoning scheme and would seemingly not be covered under the preexisting nonconformity exception. There is also evidence that the township does not contemplate any commercial activity in the Building. (Doc. No. 48-6 Ex. C at 2.) Further, while the township allows a non-impact home based business to be performed in any zone, it can only be conducted within a dwelling, which is defined as a structure used exclusively for residential occupancy. Zoning Ordinance, Section 112. As Weinstein himself admits, the Building at issue would currently not fit this definition. (Hr'g. Tr. at 54: 2-9.) Given these variables, the Defendants argue that it was an unfounded assumption for Weinstein to conclude that the highest and best use of the Building by a potential purchaser would be as part of a home business because it is not legally permissible, which, as discussed above, is the first factor an appraiser must consider in determining the highest and best use of the property.

The Court must agree with the Defendant's challenge. Weinstein's testimony shows the speculative basis he employs in determining the highest and best use of the Building as a non-impact home based business: "there is an existing building here — I'm not one to define hardship or whatever, but there's a 19,000-square-foot facility thats currently or could have or should have been utilized for these type purposes, and there would be some use that I would believe a township would find acceptable to this 12-acre parcel . . . as I indicated for the uses for a non-impact home-based business." (Hr'g Tr. at 22: 14-23.) This statement, along with others made during his testimony, show that Weinstein essentially assumed that East Cocalico township

would either ignore or amend their zoning code to accommodate this property.  This assumption

is without adequate foundation and is speculative, especially given the changing nature of land

use and township governing bodies.  The unreliability of this assumption is only further shown

by Weinstein's own admission that guessing what might or might not be approved by the

township for an in-home business is "way beyond the scope of what I can do as an appraiser."

(Hr'g Tr. at 28: 15-20.)  As such, the Court finds that Weinstein's determination as to highest

and best use lacks adequate foundation and does not satisfy the "fit" requirement of

admissibility.

### b.  Sales Comparison

Weinstein explains in his report that the "highest and best use as improved"

determination is used "to help identify comparable properties in the Sales Comparison section of

this report."  (Weinstein Report at 44.)  Because Weinstein's highest and best use analysis is

based on inadequate foundation, the Court also finds that his sales comparison valuation is

flawed.  Accordingly, Weinstein's testimony based on this valuation method will be excluded.

### c.  Cost Approach

Unlike the sales comparison approach, the cost approach does not appear to rely on

Weinstein's "highest and best use as improved" determination or on his sales comparison

valuation.  This is shown in Weinstein's testimony, where he states that he considers the cost

approach and sales comparison approach to be of equal weight in assessing the Building's value.

(Hr'g. Tr. at 15: 1-5.)  As Weinstein explains in his report, the first step in the cost approach is to

assess the value of the land as if vacant by comparing the subject property to sales of nearby

agricultural land.  (Weinstein Report at 49.)  Because the Defendants have not put forward any

objection to Weinstein's chosen agricultural comparables and the analysis does not appear to rely on the excluded portions of Weinstein's opinions, the Court's prior findings do not automatically disqualify Weinstein's cost approach valuation.

The Defendants first claim that this is not an appropriate method of valuation for the subject property because this approach "generally is not employed to appraise properties like Plaintiffs' property; it is used to appraise properties where the improvements upon the land being appraised are new and have not yet depreciated in value." (Id. at 12.)  They further contend that even if the Cost Approach were appropriate for this property, Weinstein did not apply it reliably because he "does not account for external obsolescence in the form of zoning regulations." (Id. at 12.)

The Court is satisfied that Weinstein's use of the cost approach method of valuation was reliable and that he applied the method reliably.  The Defendants' expert chose not to use the cost approach in his appraisal because "the improvements [on the property] are older and the effects of physical deterioration and obsolescence defy accurate estimation." (Jones Report at 37.)  Weinstein admitted that the cost approach is not as reliable for much older facilities, but also explained that he chose to utilize the method because it allowed him to focus on the particular Building at issue and reconcile his results with the outcome of the comparable sales approach. (Hr'g. Tr. 17: 12-25.)  The Defendants' own expert explains in his report that "[t]he Cost Approach is also applicable when a property serves a special purpose use, particularly when there is limited or no comparable sales data available." (Jones Report at 37.)  Given the above discussion and both experts difficulty in finding comparable sales, the Court cannot find that Weinstein's use of the cost approach to value the premises was inappropriate.

The Defendants also challenge the reliability of Weinstein's application of the cost approach for various reasons.  For one, they claim he did not account for external obsolescence, but in fact it seems that he did in fact consider it in his report.  (See Weinstein Report at 60.) Further, at the *Daubert* hearing, the Defendants questioned Weinstein about various inputs he chose in his calculations and claimed that his choices lacked appropriate methodology.  (Hr'g. Tr. at 51: 10-13.)  For instance, Weinstein chose a square footage value of 44.62 for the Building at issue even though the Marshall Valuation Service gave a range between 32.88 and 46.85. (Hr'g. Tr. 50: 14-23.)  The Defendants also questioned Weinstein about his choice of degrading the Building at issue by only 10% for "functional obsolescence."  (Hr'g. Tr. at 52: 8-18.)  The Court finds that Weinstein considered these issues in his report and testimony and sufficiently explained his choices with regard to the inputs.  As with the Defendants' other challenges, the sufficiency of Weinstein's inputs can be brought out appropriately on cross examination and properly weighed by a jury in determining the weight of his conclusions.

## IV.  PLAINTIFFS' MOTION

### A.  William A. Wheatley

#### 1.  Report and Conclusions

Expert William A. Wheatley 's ("Wheatley") report deals with the design and construction of the Building at issue.  (Doc. No. 49 Ex. A at 1 (hereinafter "Wheatley Report").) After review of code requirements, examination of the Plaintiffs' building permit materials, and a walkthrough of the Building, Wheatley concludes that "[i]t is obvious that [residential use] was not the intent of the Building from its design and from its present configuration.  It is, in fact, a commercial building, a use that violates its occupancy permit issued pursuant to completion of

work under the building permit." (Wheatley Report at 9.) Relying on HVAC calculations from

E. Mitchell Swan, discussed below, Wheatley ultimately concludes

> the HVAC system provided for the building was inadequate to meet the building's needs for fresh air. The lack of fresh air caused the formaldehyde released by the building materials to accumulate rather than to dissipate, and this in turn caused the symptoms experienced that were the subject of the complaint. It is likely that if code-required volumes of fresh air were provided for the spaces, they would be occupiable now without discomfort.

(Wheatley Report at 4.) Wheatley also reports that his inspection of the Building revealed

several potential sources of formaldehyde beyond the plywood, such as the carpet, construction

glues, and office furniture. (Wheatley Report at 12.) He concludes that any of these products

could have contributed formaldehyde to the atmosphere in the Building (Id at 12), and mentions

at one point that the use of the construction glues was a "substantial contributor of

formaldehyde." (Id. at 13.)

## 2. Discussion

### a. Unsupported Assumptions

The Plaintiffs first contend that Wheatley's opinions rely on faulty assumptions and are

speculative and are therefore not helpful to the jury. (Doc. No. 53 at 3.) This challenge is

similar to the Defendants' challenge to Weinstein's opinions, and the Court will evaluate it

accordingly.

One challenged assumption is Wheatley's statement that the Building was being used as a

commercial building and that it should have therefore been designed with the more stringent

HVAC requirements for commercial buildings. Plaintiffs argue that this is an unfounded

assumption because they were issued a residential occupancy permit, which "indicates that the

township was satisfied that the Building was for a non-commercial use and was not required to meet code requirements for commercial buildings." (Doc. No. 53 at 4-5.)  Given the existence of the permit, the Plaintiffs claim that Wheatley's ultimate conclusion is based on a faulty assumption and must be excluded.  (Id.)

The Court must reject this contention.  Wheatley's qualifications as an architect are undisputed, and he is undisputedly qualified by training and experience to speak to the design of both residential and commercial buildings.  (See Hr'g. Tr. at 133-134.)  As he testified, his experience designing buildings for various uses requires that he intimately understand zoning regulations and various building codes.  (Id.)  Based on the applicable building codes, Wheatley opines that the design, present configuration, and current use render the Building commercial in nature.  (Wheatley Report at 9; Hr'g. Tr. at 135: 19-22.)  Given the discussion regarding this building above, Wheatley's assumption on these bases that this is a de facto commercial building (as to function and design) can certainly not be considered without any foundation or basis in the record.  Further, Wheatley clearly considered the township's issuance of an occupancy permit and accounts for that factor in evaluating the Building.  (Wheatley Report at 9.)  Accordingly, the Court cannot find that this assumption invalidates Wheatley's opinions or lacks any foundation in the record.

The Plaintiffs also challenge Wheatley's opinion that "the fact that so much plywood and cement was used means that extra care should have been exercised in the design of the air handling system to ensure that fresh air was provided to dissipate the formaldehyde." (Wheatley Report at 13.)  Plaintiffs contend that this statement "is predicated on the assumption that anyone who walks into a Home Depot to buy plywood knows that the air handling system needs to meet

certain specifications.  This unsubstantiated assumption does nothing to aid the trier of fact."
(Doc. No. 53 at 5.)

The Court cannot agree that this assumption undermines Wheatley's conclusions such
that they are not helpful.  In fact, it is not clear that this is an assumption that Wheatley relied on
at all in coming to any of his conclusions.  It is not disputed that Mr. Steffy himself served as the
general contractor on the Building.  (Doc. No. 1 ¶ 13.)  Wheatley, as an experienced architect, is
well qualified to opine as to the appropriate amount of care that must be exercised in
construction of a building and basic industry standards for engaging in that activity.  Mr. Steffy's
subjective understanding of those industry standards with regard to plywood and formaldehyde
exposure does not invalidate Wheatley's opinion that the construction of this Building did not
live up to these standards.

### b.  Unreliability

The Plaintiffs also challenge Wheatley's methodology on the grounds that it is unreliable
because he did not employ any scientific analysis and relied on little beyond his own intuition.
(Doc. No. 53 at 6-7.)   Plaintiffs essentially argue that Wheatley should not be able to offer
opinions on several of these matters because he has not conducted sufficient testing to qualify his
results.  (Id.)  Relying on Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000), the
Plaintiffs argue that Daubert requires more than a haphazard intuitive inquiry.  (Doc. No. 53 at 6-
7.)

One opinion Plaintiffs target under this challenge is Wheatley's determination that the
HVAC system provided for the Building was inadequate.  (Wheatley Report at 15.)  They claim
this determination is unreliable because Wheatley solely relies on calculations performed by

another defense expert, E. Mitchell Swan ("Swan"), and Wheatley himself "did not conduct any scientific testing to determine the air flow, intake, or exhaust in the building on his own."  (Doc. No. 53 at 7.)

The Court does not find Wheatley's methodology unreliable on this basis.  For one, Wheatley does not solely rely on Swan's calculations to make his determination.  In addition to the calculations done by Swan on the HVAC system, Wheatley reviewed research on formaldehyde in construction products, the applicable building codes, permits, and submitted plans.  He also made a personal inspection of the Building.  Rule 703 provides the standard to review the bases of expert opinion, providing:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonable relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed. R. Evid. 703.  Plaintiffs point to no authority for their contention that an expert such as Wheatley cannot rely on the reports of an engineering expert in reaching conclusions, and nothing in Rule 703 would bar such reliance.  The Court recognizes that there is support for the proposition that an expert cannot merely become a mouthpiece for the opinions of another expert.  Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 614 (7th Cir. 2002).  In this situation, however, the Court finds that Wheatley used this information appropriately along with other data to espouse an opinion within his area of expertise as an architect.  See Matter of James Wilson Associates, 965 F.2d 160, 173 (7th Cir. 1992) ("The architect could use what the [consulting] engineer told him to offer an opinion within the architect's domain of expertise, but he could not testify for the purpose of vouching for the truth

21

of what the engineer had told him—of becoming in short the engineer's spokesman.")

Additionally, in this case Swan is also offered as an expert and subject to the Plaintiffs'

challenges (discussed below).  As such, the Court finds that Wheatley's reliance on Swan's

calculations is appropriate and does not make his opinions unreliable such that they should be

excluded.

The Plaintiffs also take issue with Wheatley's opinion that the Building has more

plywood than normal in it, claiming that this is a "conclusory statement without the benefit of

any scientific testing or back up data whatsoever."  (Doc. No. 53 at 7.)

The Court cannot agree that the lack of "scientific testing" renders this opinion

unreliable.  As discussed above, Wheatley became very familiar with the Building through

review of the plans and a personal inspection.  He also testified about his extensive background

experience: "[i]n my career, I've designed at least a thousand buildings, probably several

thousand, I have seen many thousands more, and I have never seen a building with this amount

of plywood in it."  (Hr'g. Tr. at 139: 8-10.)  In cases where an expert is relying on knowledge

and experience to provide an opinion, the standard *Daubert* factors are not always applicable.

Montgomery v. Mitsubishi Motors Corp., 448 F. Supp. 2d 619, 628 (E.D. Pa. 2006) (citing

United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000)).  As such, the reliability

assessment must focus "upon personal knowledge and experience."  Id.  Given Wheatley's

credentials and experience along with his examination of the Building at issue, the Court cannot

say that his opinion about the amount of plywood is unreliable based on a lack of scientific

testing.

The Plaintiffs also target Wheatley's conclusion that "[i]t is likely that if code-required

volumes of fresh air were provided for the spaces, they would be occupiable now [presumably as of January 2008] without discomfort" on this basis.  (Doc. No. 53 at 8.)  Wheatley explains in his testimony that he based this conclusion on Montz's test results, which showed the steady decline of the presence of formaldehyde.  (Hr'g. Tr. 138: 11-17.)  As such, Wheatley did not base this opinion solely on his knowledge of formaldehyde and a personal inspection of the Building. Further, this opinion says less than Montz himself, who without considering a commercial-grade ventilation system states in his report that "concentrations of formaldehyde should be at non-detectable levels at some point in 2007."  (Montz Report at 11.)  Accordingly, the Court is satisfied with the reliability of Wheatley's methods and data used to reach this conclusion.

The Court agrees with the Plaintiffs' reliability challenge as to Wheatley's statement that construction glues were a substantial contributor to the formaldehyde levels in the Building, however.  While maintaining that all glue contains formaldehyde, Wheatley admitted in his testimony that certain glues used in construction have replaced urea-formaldehyde glues and contain a much smaller quantity of formaldehyde to off-gas.  (Hr'g. Tr. at 141: 1-9.)  He also admitted that without the MSDS sheet for a particular product, it would not be possible to know whether the product was a high offgasser of formaldehyde or not.  (Hr'g. Tr. at 141: 10-14.) Despite this, Wheatley's report neither discusses his review of the MSDS sheet for the specific glue used in construction of the Building nor sets out any statistics for the glue that he may have gleaned from other sources.  In fact, he identifies the glues that he observed on his personal inspection only as "[c]onstruction glues used to glue plywood to studs and to assemble cabinet work."  (Wheatley Report at 12.)  Further, unlike Montz, Wheatley did not estimate any precise figure about the quantity of glue used in the construction or perform any scientific tests on the

glue to learn the formaldehyde concentration. Without this fundamental information, it is impossible for Wheatley to conclude that the glue was a substantial contributor of the formaldehyde levels in the Building.

Also, despite Defendants' contention, Wheatley's experience as an architect does not salvage the reliability of his methodology in coming to this conclusion. He nowhere indicates that he could ascertain the type of glue from visual inspection. It is also not explained how an estimation of the contribution of formaldehyde levels in a building could be made from such an inspection. Given his admission that some glues offgas a much smaller quantity of formaldehyde and his failure to identify the glue used in the Building or otherwise test it, the Court does not find that his conclusion about the glue's substantial formaldehyde contribution to be reliable and he will not be permitted to opine as such in his testimony. Despite this, Wheatley's opinion about the substantial formaldehyde contribution of the glue does not invalidate the methodology used in reaching his overall conclusion about the inadequate design of the Building and HVAC system. Accordingly, the Court's finding about unreliability of this single opinion does not invalidate Wheatley's overall conclusions about the Building and his testimony will not be excluded entirely.

### B. E. Mitchell Swan

Swan's report provides an engineering analysis of the HVAC system in the Building. Like Wheatley, he concludes that the Building is not residential and that the HVAC system should have been designed as a commercial grade system. (Doc. No. 49 Ex. B at 7 (hereinafter "Swan Report").) Despite this, Swan concludes that the system was inadequate even under the residential code. (Swan Report at 10.)

24

The Plaintiffs argue that "Mr. Swan's report suffers from the same faulty assumption sas Mr. Wheatley's analysis — that the Building should have had the HVAC components of a "commercial building." (Doc. No. 53 at 8-9.)  They argue, as with Wheatley, that this faulty assumption renders the report useless.  (Id.)  They also argue that "Mr. Swan assumes that the plywood sold to plaintiffs was intended only for use in a commercial setting. . . . Plaintiff's received no warning at all."  (Id.)

As with Wheatley, the Court is not persuaded that Swan's report is unreliable based on these objections.  In coming to his conclusion, Swan reviewed the Building project records, equipment data sheets, code and permit submission records, and made an inspection.  (Swan Report at 1.)  He also testified that in determining the appropriate capacity of an HVAC system, the considerations are "types of things being done, what are the people going to do in that building, how many people are there, operational hours, is it 9:00 to 5:00, is it 24 hours."  (Hr'g. Tr. at 110: 4-17.)  Given Swan's expertise, the data he consulted, and his personal inspection with regard to this particular Building, the Court is satisfied that his opinion that the Building should have been designed in accord with commercial codes is not so lacking in record support to make it unhelpful to the jury.

It is also not clear from his report or testimony that Swan relied on any assumption that the plywood could only be used in commercial buildings or that the Plaintiffs received a warning in analyzing the Steffy building's HVAC system.  As with Wheatley, this would not be relevant to his analysis of the Building or it's HVAC system.  Because the Court finds Swan's methodology otherwise reliable, Swan's testimony will not be excluded.

**C.  Helpfulness to the Jury**

The Plaintiffs' final argument against admission of both Wheatley and Swan's testimony is that their opinions are not helpful to the jury because comparative fault is irrelevant to a strict liability claim under Pennsylvania law.  (Doc. No. 53 at 8.)  There is no question that the Pennsylvania Supreme Court has specifically declined to extend negligence concepts to the area of strict products liability, holding "negligence concepts have no place in a strict liability action."  Kimco Development Corp. v. Michael D's Carpet Outlets, 637 A.2d 603, 606 (Pa. 1993).  While the Defendants claim that Wheatley and Swan's testimony is proper as it relates to the causation element of strict liability (Doc. No. 50 at 12), their own cases cited in support of that proposition show that Defendants do not share the same burden as the Plaintiffs when introducing causation evidence in defense of strict liability claim.  See e.g., Wilson v. Vermont Castings, Inc., 170 F.3d 391, 396 (3d Cir. 1999) ("Although a defendant cannot argue that a plaintiff was negligent, a defendant can argue that the plaintiff's conduct, not the alleged defect, was the *sole cause* of her injuries.") (emphasis added); Madonna v. Harley Davidson, Inc., 708 A.2d 507, 508 (Pa. Super. Ct. 1998) ("a user's negligence is not relevant if the product defect contributed in *any way* to the harm.") (emphasis added).

Given these cases, the Court acknowledges that it is unlikely that the expert's testimony would be relevant or helpful to the jury as to the Plaintiffs' strict liability claim, especially considering that both challenged defense experts admitted that they could not say whether any level of ventilation would have made the Building safe from the offgassed formaldehyde.  (Hr'g. Tr. at 128: 7-14 (Swan); Hr'g Tr. at 142: 17-24 (Wheatley).)  Despite this, the Plaintiffs have advanced several claims in their complaint, including negligence, and have not made any argument that this testimony would not be helpful to the jury as to those theories of liability.  In

26

acknowledgment of this, the Plaintiffs only ask that "the report be limited in its scope if it is allowed."  (Doc. No. 53 at 8.)  Because the testimony will be helpful to the jury on at least some issues in contention, even if some form of limitation is appropriate, the Court does not believe this request is appropriate in the context of this motion.  This inappropriateness is evidenced by the lack of development of the issue in the Plaintiffs' brief; they offer only one paragraph of discussion on this contention and never even suggest what type of limitation they seek. Accordingly, the Court will deny Plaintiffs' request without prejudice to raise the issue again in a more appropriate pre-trial motion.

## V.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motions to exclude (Doc. Nos. 46, 48, 58, 61) and grant in part and deny in part the Plaintiffs' motion to exclude (Doc. No 49).  An order consistent with this memorandum will follow.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DARREL STEFFY AND | : | |
| SUSANNE STEFFY | : | **Case No. 1:06-CV-02227** |
| | : | |
| v. | : | **(Chief Judge Kane)** |
| | : | |
| | : | |
| THE HOME DEPOT, INC. AND | : | |
| PATRIOT TIMBER PRODUCTS | : | |
| INTERNATIONAL, INC. | : | |

## ORDER

**AND NOW**, this 10th day of December 2008, upon consideration of the Defendants' and

Plaintiffs' motions to exclude expert testimony filed in the above-captioned matter, and for the

reasons set forth in the Court's memorandum opinion filed herewith, **IT IS HEREBY**

**ORDERED THAT:**

1.    The Defendants' Motions to Exclude (Doc. Nos. 46, 48, 58, 61) are **GRANTED IN PART** and **DENIED IN PART** as follows:

       a.    Plaintiff expert Elliot Weinstein will not be permitted to testify as to his "sales comparison approach" valuation of the subject property.

       b.    The motion is otherwise **DENIED**.

2.    The Plaintiffs' Motion to Exclude (Doc. No. 49) is **GRANTED IN PART** and **DENIED IN PART** as follows:

       a.    Defense expert William Wheatley will not be permitted to testify that the construction glue used in the Plaintiffs' building was a substantial contributor to the formaldehyde levels in the building.

       b.    The Plaintiffs' request that the Court limit the scope of expert's testimony as it relates to strict liability is **DENIED** without prejudice to raise the issue again in an appropriate pre-trial motion.

c.      The motion is otherwise **DENIED**.

_ s/ Yvette Kane_____
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania