**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DARREL STEFFY AND** | : | |
| **SUSANNE STEFFY** | : | **Case No. 1:06-CV-02227** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| | : | |
| **THE HOME DEPOT, INC. AND** | : | |
| **PATRIOT TIMBER PRODUCTS** | : | |
| **INTERNATIONAL, INC.** | : | |

**<u>MEMORANDUM</u>**

Before the Court are separate motions for summary judgment pursuant to Rule 56(c) of

the Federal Rules of Civil Procedure by Defendant The Home Depot, Inc. ("Home Depot")(Doc.

No. 64) and Defendant Patriot Timber Products International, Inc. ("Patriot Timber")(Doc. No.

63).  The motions are fully briefed and are ripe for disposition.  For the reasons that follow, the

motions will be granted in part and denied in part.

**I.      BACKGROUND**

**A.  Factual Background[1]**

Plaintiff Darrel Steffy is the president and CEO of Steffy Concrete, Inc.  (<u>See</u> Doc. No.

64-6 Ex. B, Deposition of Darrel Steffy at 10: 21-25 (hereinafter "Steffy Dep").)  Mr. Steffy has

30 years experience in the construction industry.  (Doc. No. 67 ¶ 2.)  In addition to his work in

his own concrete business, Mr. Steffy also worked for his father as a masonry and concrete

contractor, and as a builder and land developer.  (<u>Id.</u>)  He lacks any formal training in designing

buildings or installation of HVAC systems.  (Doc. No. 63 ¶ 11.)

---

[1]  The following are undisputed facts unless otherwise indicated.  (<u>See</u> Doc. Nos. 64; 67; 76; 77.)

In September 2005, Darrel Steffy and his wife, Plaintiff Susanne Steffy, began construction of a building on their property for various uses, including: storage, fitness, entertaining friends, display space for hunting trophies, and office space.  (Doc. No. 67 ¶ 3.)  Mr. Steffy served as the building's general contractor, and made all decisions regarding the project.  (Doc. No. 63 ¶¶ 16-17.)  He hired Hoover Construction Company to erect the pre-engineered steel exterior of the building, which had no set interior design.  (Doc. No. 67 ¶ 6.)  The pre-engineered structure was not accompanied by instructions or recommendations on how to finish the building, but Mr. Steffy did consult with Hoover Construction occasionally for information on the structure's load bearing capacity.  (Id. ¶ 6; see also Steffy Dep.at 43: 11-14.)  Mr. Steffy also hired Quality Design and Drafting to assist him with some of the more ornamental designs on the interior of the structure and the 'Steffy Concrete' sign that hangs on the outside of the building.  (Doc. No. 63. ¶ 10.)  Mr. Steffy handled all other aspects of the design and construction of the interior of the building by himself.  (Id. ¶ 17.)  He did not consult an architect for the project.  (Id. ¶ 14.)  He installed his own HVAC system with advice from L&G Mechanical, his heating and cooling system supplier.  (Id. ¶¶ 11, 13.)  Mr. Steffy also did not consult an indoor quality air company during the building process.  (Id. at 140-141: 25, 1.)  The building as finally designed has about 20,000 square feet of floor space and cost about $900,000 to build.  (Doc. No. 67 ¶¶ 5, 9.)  Steffy chose to not install windows in the building because the extra light would be harmful to the hunting trophies he planned to display.  (Doc. No. 63 ¶ 15.)

While browsing around Home Depot, Mr. Steffy spotted plywood and decided to use it to panel the interior walls of the building (other than the garage) because it would be cheaper and

more sturdy than drywall.  (Doc. No. 67 ¶ 11; see also Steffy Dep.at 70: 10-25.)  On or about

November 10, 2005, he purchased 300 four by eight foot sheets of 3/4 inch thick, 13 ply, cabinet

grade plywood from Hope Depot at $23.00 per sheet.  (Id. ¶ 11.)  He purchased an additional

100 sheets of similar plywood on January 3, 2006.  (Id. ¶ 14.)  This plywood was supplied to

Home Depot from Defendant Patriot Timber Products.  (Doc. No. 63 ¶ 17.)  Mr. Steffy's contact

at Home Depot for the purchase of this plywood was David Mitchell, who worked at the

"contractor sales desk."  (Doc No. 67 ¶ 12; see also Doc. No. 64-7 Ex. C, Deposition of David

Mitchell at 11-12: 8-23, 1-3 (hereinafter "Mitchell Dep").)  The Defendants allege that Mr.

Steffy did not tell David Mitchell how he intended to use the plywood or why they were

purchasing the plywood.  (Doc. No. 67 ¶ 13; see also Mitchell Dep. at 21: 8-24.)  The Plaintiffs

allege that Mr. Steffy did in fact tell Mitchell that he intended to use the material as wall

paneling.  (Doc. No. 77; see also Doc. No. 74-4 Ex. 2, Declaration of Darrel Steffy, ¶¶ 3-4

(hereinafter "Steffy Decl."); Doc. No. 74-4 Ex. 3 Declaration of Scott Achey, ¶¶ 7-8 (hereinafter

"Achey Decl.").)

     After the project was completed, starting around February 2006, people inside the

building began to notice adverse effects from being inside the structure, including: watering and

burning eyes, headaches, and burning in the throat.  (Doc. No. 63 ¶ 21; Steffy Dep. at 65-67.)

Mr. Steffy investigated the causes of the irritation by talking to manufacturers of the masonry,

concrete, insulation, and heating system in the building; they all denied that their products could

be causing the problems after review and Mr. Steffy took them at their word.  (Doc. No. 63 ¶

26.)  Eventually, a tile-setter who was working in the building suggested to Mrs. Steffy that the

irritation was the result of formaldehyde from the plywood.  (Id. ¶ 23; see also  Doc. No. 63-6

Ex. D, Deposition of Douglas Clelan, at 19.)  After a handheld device revealed formaldehyde in

the air, Mr. Steffy contacted Edward Montz Jr.'s ("Montz") of Indoor Air Solutions ("IAS") to

test the building's air on July 20, 2006. (Doc. No. 67 ¶¶ 19-20.)  After initial air testing, IAS

found that the formaldehyde levels were "far higher than any concentrations that we have

observed in any newly constructed space, to date, as a result of construction materials alone."

(Doc. No. 63-7, Ex. G at 6 (hereinafter "Montz Report").)  Following this testing, a second study

was proposed by Plaintiffs aimed at evaluating Mr. Steffy's concern about paneling containing

formaldehyde."  (Doc. No. 63 ¶ 44.)  IAS took two samples of plywood, which were comprised

of five four-by-eight sheets taken randomly throughout the Building.  (Montz Report at 4.)

These samples were then sent to a lab where they were loaded into a chamber for emissions

monitoring; a process called large chamber ASTM Method.  (Id.)  Following the results from

these tests on the plywood paneling, Montz concluded that "[t]he paneling obtained by Mr.

Steffy and installed in the above-referenced building is a very potent source of formaldehyde in

the building (estimated to be over 20 times the OSHA maximum Permissible Exposure Limit for

industrial workplace environments at the time of installation)."  (Id. at 10.)  He further concludes

that of the various options to fix the problem, the best would be "a complete removal of all of the

paneling and any reservoirs in the building which currently exist."  (Id. at 11.)  Defense experts

disagree with Montz's conclusion on causation and instead conclude that decisions made in

construction of the building, other formaldehyde producing materials, and an inadequate

ventilation system have caused the formaldehyde problem.  (Doc. No. 64 ¶¶ 60-64.)  Expert

William A. Wheatley 's ("Wheatley") concludes that the building was designed as a commercial

structure and that the HVAC system is inadequate:

4

> the HVAC system provided for the building was inadequate to meet the building's needs for fresh air.  The lack of fresh air caused the formaldehyde released by the building materials to accumulate rather than to dissipate, and this in turn caused the symptoms experienced that were the subject of the complaint.  It is likely that if code-required volumes of fresh air were provided for the spaces, they would be occupiable now without discomfort.  The amount of formaldehyde released will decrease over time, and will not remain a problem.

(Doc. No. 63-8, Ex. L at 15 (hereinafter "Wheatley Report"); see also Doc. No. 63-9, Ex. P at 12 (hereinafter "Swann Report").)  There is some agreement between Plaintiff and Defense experts that the formaldehyde problem in the building will slowly dissipate over time, (Montz Report at 11; Wheatley Report at 15), but Plaintiffs' allege that the problem is not resolved. (Doc. No. 76 ¶ 74.)

**B.  Procedural History**

In their complaint, the Plaintiffs have stated causes of action for strict liability and negligence against both defendants.  (Doc. No. 1 ¶¶ 50-59.)  Solely against Defendant Home Depot, Plaintiffs have included claims for breach of implied warranties of merchantability and fitness for a particular purpose, fraud, negligent misrepresentation, breach of implied consumer product warranties under 15 U.S.C. § 2301, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.  73 P.S. § 201 et seq.  (Id. at ¶¶ 59-91.)  While Plaintiffs' complaint initially asserted both personal injury and property damage claims, the personal injury claims have been withdrawn.  (Doc. Nos. 65, 77; see also Doc. No. 64-8.)

On December 10, 2008, the Court issued a memorandum and order adjudicating the parties' Daubert motions.  (Doc. No. 160.)  The Court will rely on expert reports and affidavits in the record to the extent they were found admissible.

5

### C.  Standard of Review

The Defendants have separately moved for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.  Anderson, 477 U.S. at

249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## II.    LIABILITY

Pennsylvania strict products liability law allows recovery where a product in a defective condition, unreasonably dangerous to the user or consumer, causes harm to the plaintiff.  Phillips v. A-Best Products Co., 665 A.2d 1167, 1170 (Pa. 1995).  There are three kinds of defective conditions that give rise to a strict liability claim: design defect, manufacturing defect, and defect by failure to provide adequate warnings for a product's safe use.  Id. (citing Walton v. Avco Corp., 610 A.2d 454, 458 (Pa. 1992)).  All three types of defect have been alleged in this case.

Both Defendants make several arguments that raise issues against Plaintiffs' ability to make a showing sufficient to establish the existence of essential elements of their claims.  The Court will address these contentions as they were argued by the parties.

### A. Intended-Use

The Defendants argue that the Plaintiffs' use of the plywood was not an "intended-use" and cannot support a strict liability claim.  Both Defendants argue that the use of the plywood in a non-ventilated building was inconsistent with "known principles of building design," as espoused by their experts.  (Doc. Nos. 65 at 23; 66 at 24.)  Patriot Timber contends that improper design of the structure at issue "necessarily demonstrates that they used the plywood in a manner that was not intended by Patriot."  (Doc. No. 66 at 24.)  Home Depot further argues that paneling

the walls in cabinet grade plywood and not consulting an indoor air quality company shows the non-intended use of the product.  (Doc. No. 65 at 23.)  They claim that their experts have opined that the building was improperly designed and the Plaintiffs have offered no contrary evidence, so they cannot withstand summary judgment on strict liability.

In strict-liability actions, a manufacturer is liable only for harm that occurs in connection with the manufacturer's intended use for the product by an intended user; there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a manufacturer. DGS, 898 A.2d at 600 (citing Phillips v. Cricket Lighters, 841 A.2d 1000, 1007 (Pa. 2003)).  The "intended use" inquiry is construed strictly and even "foreseeable misuse of a product will not support a strict liability claim.  Id. at 601.  One method of determining this "manufacturer's intent" has been by reference to the owner's manual and warning labels on the product itself. See Clevenger v. CNH America, LLC, 2008 WL 2383076, *4 (M.D. Pa. 2008).

As Patriot Timber acknowledges, "[p]lywood is a common building material with a multitude of uses . . . ."  (Doc. No. 78 at 8.)  There are no instructions available on this plywood; a Material Safety Data Sheet ("MSDS") sheet composed for the plywood included warnings about formaldehyde and the need for "adequate" ventilation, but the record shows that the Plaintiffs never received the MSDS sheet or these warnings (discussed further below).  As such, it is difficult to narrow down a specific intended use for the plywood on this record and the general nature of the product.  The Court agrees with the Plaintiffs, however, that at minimum the product's intended use anticipated direct exposure to interior air of buildings and residences. (Doc. No. 75 at 11.)  In this case, Mr. Steffy used the plywood as paneling for the building's interior walls, opting for plywood instead of drywall primarily because he wanted extra

8

durability in his walls.  (Steffy Dep at 73.)  The plywood itself was structurally suited to be wall-paneling.  Defendants' expert Wheatley himself suggests that plywood paneling—albeit exterior-grade— was suitable at least in the trophy room of the building to accommodate the heavy hunting trophies.  (Wheatley Report at 14.)  As such, the Court cannot agree that use of the plywood in this building, even considering its design and ventilation, was necessarily an unintended use of a product when that product is meant to be used indoors in buildings and residences.  Given the above and considering the evidence in the light most favorable to the Plaintiffs, the Court finds that Defendants are not entitled to summary judgment on these grounds.

### B.  Failure to Warn

Patriot Timber argues that the Plaintiffs' failure to warn theory is unsupported by the evidence because the plywood's MSDS contained sufficient warnings to dispel their duty to warn of the product's inherent dangers.  (Doc. No. 66 at 25.)  Plaintiffs argue that the MSDS sheet is irrelevant because they had no access to the MSDS sheet or other warnings prior to purchasing the plywood.  (Doc. No. 75 at 12.)  Plaintiffs further contend that the MSDS sheet itself was inadequate to warn the them of the dangers.  (Id.)  Plaintiffs rely on Montz to support this contention, who opines in his report that "the MSDS does not comply with OSHA requirements for disclosure of hazards of formaldehyde in this particular product.  Specifically there is no section identifying hazardous ingredients and their respective percentages . . . . These recommendations are not practical for controlling consumer exposures . . . ."  (Montz Report at 10.)  In reply, Patriot Timber again argues that Montz is not qualified to opine as to the adequacy of warnings.  (Doc. No. 78 at 9.)

A product can be considered defective under products liability principles when it is distributed without adequate warnings to notify the ultimate user of the inherent dangers in the product.  Mackowick v. Westinghouse Elec. Corp., 575 A.2d 100, 102 (Pa. 1990).  "Where warnings or instructions are required to make a product non-defective, it is the duty of the manufacturer to provide such warnings in a form that will reach that ultimate consumer and inform of the risks and inherent limits of the product.  The duty to provide a non-defective product is non-delegable . . . ."  Avco Corp., 610 A.2d at 458-59 (quoting Berkebile v. Brantly Helicopter Corp., 337 A.2d 893, 902-903 (Pa.)).  To proceed on a failure to warn theory, a plaintiff must establish that 1) a warning was either absent or inadequate, and 2) the user would have avoided the risk had he been advised of it by the seller.  Blake v. Greyhound Lines, Inc., 448 F. Supp. 2d. 635, 642 (E.D. Pa. 2006) (citing Phillips v. A-Best Prods. Co., 542 Pa. 124, 665 A.2d 1167, 1171 (Pa.1995)).  A warning must be directed to the understanding of the intended user, and it is sufficient if it adequately notifies the intended users of the unobvious dangers inherent in the product.  Mackowick, 575 A.2d at 102.  In addition, "to reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury."  Pavlik v. Lane Ltd./Tobacco Exporters Int'l, 135 F.3d 876, 881 (3d Cir.1998).  The plaintiff enjoys the benefit of a rebuttable presumption that an adequate warning would have been heeded if it had been provided.  Id.

Initially the Court notes that the MSDS sheet referred to by Patriot Timber is a document compiled to comply with 19 C.F.R. § 1910.1200, a regulation promulgated under the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. § 651 *et seq.*  As both the regulation

itself and OSHA make clear—and as the Defendants themselves have argued at other points in

this litigation—these rules are meant to protect workplace and not consumer safety.  <u>See</u> 19

C.F.R. § 1910.1200 ("The purpose of this section is to ensure that the hazards of all chemicals

produced or imported are evaluated, and that information concerning their hazards is transmitted

to employers and employees.") As such, the Court cannot find that the MSDS sheet on this

plywood was directed at Mr. Steffy as a consumer.

Further, the Plaintiffs did not receive the MSDS sheet in question, nor is it even clear

from the record that such documentation was available at the Home Depot when he purchased

the plywood.  (<u>See</u> Mitchell Dep. at 39-41; <u>see also</u> Steffy Dep. at 79-83.)  Patriot Timber

suggests that the MSDS would have been available upon request (Doc. No. 78 at 8 n.3), but

offers no authority to suggest that a consumer of its product is required to request allegedly

necessary warnings.  Additionally, while it appears from the record that there is growing

awareness of formaldehyde contained in building products, it is far from clear that these issues

have become general public knowledge such that the risks of formaldehyde saturation in

plywood would be an open and obvious danger such as the Defendants seem to argue.  As such,

considering the evidence in the light most favorable to the Plaintiffs, the Plaintiffs have made a

showing sufficient to establish the existence of this element and the Defendant is not entitled to

summary judgment on this claim.

## C.  Unreasonably Dangerous Product

Both Defendants claim that the plywood itself is not "unreasonably dangerous" because

formaldehyde is common in all building products.  (Doc. No. 66 at 22.)  The Defendants argue

that Plaintiffs have neither identified any objective standard or regulation that demonstrates the

plywood emitted excessive amounts of formaldehyde nor provided a qualified expert to testify to the fact the formaldehyde off-gassing was excessive and unreasonable.  (Id. at 23.)  Home Depot adds that "it is well known that plywood, like many building products, contains formaldehyde. And that cabinet grade plywood is not appropriate for use as wall paneling because its thickness requires much more glue, and therefore much more formaldehyde."  (Doc. No. 65.)  Under these circumstances, Patriot Timber contends that the jury will have to speculate that the off-gassing rate shown by Montz's tests is excessive and dangerous.  (Id.)  The Plaintiffs argue that they have made a legally sufficient claim that the plywood was unreasonably dangerous and that wall-paneling was an "intended use" of the cabinet-grade plywood.  (Doc. No. 75.)

The Pennsylvania Supreme Court has held that before a products liability action is submitted to a jury, it is a judicial function as a threshold matter to determine whether, under plaintiff's averment of facts, recovery would be justified.  Azzarello v. Black Bros. Co.. Inc., 391 A.2d 1020, 1026 (Pa. 1978).  To make this threshold determination, the court must engage in a risk-utility analysis, weighing a product's harms against its social utility, considering:

> (1) The usefulness and desirability of the product--its utility to the user and to the public as a whole; (2) The safety aspects of the product--the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

Moyer v. United Dominion Industries, Inc., 473 F.3d 532, 538 (3d Cir. 2007) (quoting

Dambacher v. Malis, 485 A.2d 408, 423 n.5 (Pa. 1984)).  In weighing these factors, the Court

must also keep in mind the intended purpose of the product; these risk-utility conclusions

necessarily depend to some extent on whether the court construes the intended purpose of a

product broadly or narrowly.  See Schindler v. Sofamor Inc., 777 A.2d 765, 773 (Pa. Super. Ct.

2001).  Relying on these factors and considering the facts in the light most favorable to the

plaintiff, see Moyer, 473 F.3d at 538 (citing A-Best Prod. Co., 665 A.2d at 1171), the court

determines whether the risk-utility balance so favors the manufacturer that the product cannot be

deemed unreasonably dangerous as a matter of law.

    The plywood in this case satisfies the threshold unreasonably dangerous inquiry.  As

discussed above, the plywood at issue in this case has a variety of uses and its intended purposes

will be construed broadly.  Most any intended use of this plywood, however, will have direct

exposure to the interior air of buildings and residences.  With this intended use in mind, the

Court will consider the above factors highlighted by the parties in their submissions.[2]

### 1.  Product Utility and Likelihood of Injury

    While the plywood paneling is certainly useful for interior construction purposes—as

demonstrated by Mr. Steffy himself in choosing it for his building because of the product's

durability and aesthetics—it is also clear from the expert reports that the formaldehyde used in

such products has significant probability to cause serious illness or afflictions when people are

exposed to high concentrations.  Indeed, formaldehyde in plywood has been the subject of recent

federal government studies from the Center for Disease Control and the United States House of

---

[2]  The parties have not offered argument or pointed to any submission with regard to the 3rd, 4th, and 7th factor discussed above, and the Court will consider them as neutral.

Representatives Committee on Oversight and Government reform.  (See Doc. No. 75-4, Ex. 2.)

Patriot Timber's own MSDS sheet lists some dangers of gaseous formaldehyde, warning:

> [Gaseous formaldehyde] [m]ay cause temporary irritation to eyes,
> nose and throat.  Some reports suggest that formaldehyde may cause
> respiratory sensitization, such as asthma, and that pre-existing
> respiratory disorders may be aggravated by exposure.  Formaldehyde
> is listed by the International Agency for Research on Cancer (IARC)
> as a probable human carcinogen.

(Doc. No. 63-6.)  Though the Plaintiffs provide no statistical evidence of the rate of such injury,

the Court finds that the evidence, taken in the light most favorable to the Plaintiffs, suggests the

plywood has a significant likelihood to cause serious injury when used for its intended purpose.


## 2.  Exercise of Care and Awareness of Inherent Dangers

The proper focus in applying the fifth factor is an objective inquiry into "whether the

class of ordinary purchasers of the product could avoid injury through the exercise of care in use

of the product, not whether this particular plaintiff could have avoided this particular injury."

See Surace v. Caterpillar Inc., 111 F.3d 1039, 1051 (3d Cir. 1997); see also Street v. Sunbeam

Products, Inc., No. 07-2772, 2008 WL 4899463, *13 (E.D. Pa. 2008).  Here, the Defendants have

submitted expert evidence that Plaintiffs' building contained too much plywood for the amount

of available ventilation and that Mr. Steffy made most of the decisions during construction of

this building, but these are not proper considerations in this balancing.  It does seem clear,

however, that there are techniques available to consumers to lessen their exposure to

formaldehyde, including extra ventilation and careful choice of building materials.  Despite this,

there were no warnings that the product even contained formaldehyde, as discussed above, and it

is also not obvious from the product itself that using a certain quantity of plywood could be

dangerous.

Further, while it appears from the record that there is growing awareness of formaldehyde contained in building products, it is far from clear that these issues have become "general public knowledge," such that the users of the plywood should be aware of the danger. Considering the evidence in the light most favorable to the Plaintiffs, these factors therefore weigh in their favor.

Considering the above, the Court finds as a threshold matter that the plywood at issue was unreasonably dangerous such that the case can be submitted to the jury.

**D.  Causation**

Both Patriot Timber and Home Depot contend that the Plaintiffs have not made a sufficient showing that the plywood was the proximate cause of their damages.  (Doc. Nos. 65 at 16; 66 at 28.)  The Plaintiffs rely on Montz's expert opinion that the plywood was the cause of the dangerous formaldehyde levels in the structure based on his testing of samples of the plywood and his evaluation of the materials.  In a repackaging of their arguments attacking Montz's methodology under *Daubert*, the Defendants argue that Montz has not sufficiently linked the plywood and the formaldehyde levels in the building because he fails to account for potential alternative causes of formaldehyde in the air:

> Without testing the other products, a number of unaccounted-for alternative explanations present themselves.  For example, another untested building product may contain excessive levels of formaldehyde.  It is also possible that a number of untested formaldehyde containing products have combined to create a high level of formaldehyde.  Still another possibility is that the building, which was not designed by a professional, is improperly designed and that poor ventilation has prevented the dissipation of off-gassed formaldehyde that would have dissipated in the ordinary course.

(Doc. No. 66 at 29.)  Defendants also point to their own experts who opine that the building was not designed appropriately and the HVAC system was inadequate, which they contend caused the formaldehyde to accumulate and thereby caused the building to be uninhabitable.  (Wheatley Report at 18.)

In bringing either a negligence or strict product liability claim, Pennsylvania law requires that a plaintiff show that the breach or product defect was a substantial factor in causing the plaintiff's injury.  See Spino v. John S. Tilley Ladder Co., 696 A.2d 1169, 1172 (Pa. 1997); Brown v. Philadelphia College of Osteopathic Medicine, 760 A.2d 863, 869 (Pa. Super. Ct. 2000) (citing Vattimo v. Lower Bucks Hosp., Inc., 465 A.2d 1231, 1233 (1983)).  When considering the cause of the injury in a strict liability case, inquiry into plaintiff's use of the product may be relevant.  Com., Dept. of General Services v. U.S. Mineral Products Co., 956 A.2d 967, 975 (Pa. 2008) (citing Madonna v. Harley Davidson, Inc., 708 A.2d 507, 509 (Pa. Super. Ct. 1998)).  A user's negligence is not relevant, however, if the product defect contributed in any way to the harm; the defense must offer evidence to establish that the accident was solely the result of the user's conduct and not related in any way with a product defect.  Madonna, 708 A.2d at 509.

Montz states in his report that the concentrations of formaldehyde measured in the plywood "undoubtedly caused the elevated formaldehyde levels detected in the space," and ultimately opines that "the paneling obtained by Mr. Steffy and installed in the above-referenced building is a very potent source of formaldehyde in the building."  (Montz Report at 7, 10.)  The Plaintiffs argue that these conclusions are sufficient to establish the "substantial factor" requirement for causation under Pennsylvania law.  The Court agrees.  The causal connection

16

between Defendants' conduct and Plaintiffs' injuries is not too remote, and after considering the

evidence in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs have

made a showing sufficient to establish the existence of this element of their claims.  The

Defendants are not entitled to summary judgment on this ground.

### E.  Expert Medical Testimony

Patriot Timber argues that Plaintiffs have not presented the necessary expert testimony to

establish that formaldehyde offgassing plywood was unsafe for its intended use due to the

adverse human health effects of exposure to formaldehyde.  (Doc. No. 66 at 21.)  Relying on

DGS, 898 A.2d at 590, Patriot Timber argues that the plaintiff is required to prove that the

building material rendered the building 'unsafe for occupancy,' which is shown by evidence of

increased risk of future harm as a result of contamination.  (Doc. No. 63 at 21.)  On this issue,

the Plaintiffs' expert Montz states in his report:

> Formaldehyde is also a concern because in the United States it is a
> probable carcinogen and other countries have categorized it as a
> known carcinogen.  The long term potential for increased cancer risk
> is valid and is a factor to be considered in future remediation of this
> building.   Secondly, formaldehyde is a known and documented
> sensitizer and considerable care should be given whenever any
> individual is exposed to a chemical which has the potential to cause
> sensitization. . . . Such sensitization can be extremely unpleasant and
> can be debilitating for the individual who becomes sensitized.

(Montz Report at 9.)  In a declaration by Montz submitted by the Plaintiffs in defense of the

present motion, Montz further points to government studies discussing the health risks of

overexposure to formaldehyde.  (Doc. No. 75-4 Ex. 2, Declaration of Edward Montz, Jr., ¶¶ 3-4

(hereinafter "Montz Decl.").)  Despite this, Patriot Timber contends that Plaintiffs have offered

no legitimate evidence because this subject is beyond the general experience of lay persons and

Montz as an air quality expert is unqualified to offer expert medical testimony on the causal relationship between exposure to formaldehyde and increased risk of adverse human health effects.  (Id. at 22.)  In response, the Plaintiffs contend that "[t]he record contains ample evidence . . . that high levels of formaldehyde gas in the interior atmosphere of a premises and the immediate impact of that contamination upon the comfort of the occupants can make it untenable to remain in that premises for significant periods of time."  (Doc. No. 75 at 3.) Plaintiffs additionally argue that Montz's credentials and preparation qualify him to give expert testimony on the dangers of formaldehyde in an indoor space.  (Id. at n.3.)

In Redland Soccer Club, Inc. v. Department of the Army, 696 A.2d 137, 146 (Pa. 1997), the Pennsylvania Supreme Court laid out the standard elements required to prevail on a common law claim for medical monitoring:

> (1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

Redland is an extension of the Pennsylvania Supreme Court's holding in Simmons v. Pacor, Inc., 674 A.2d 232 (1996), where the court first recognized a common law claim for medical monitoring, but had no occasion to articulate formal elements of proof for that claim. Redland, 696 A.2d at 146.  Patriot Timber contends that proof of the first four elements is required "in any case involving the risk of future adverse health effects . . . ."  (Doc. No. 78 at 2.) This argument is undercut by DGS, however, wherein the Pennsylvania Supreme Court

18

distinguishes the strict *Simmons* elements from cases of property damage caused by chemical contamination:

> Monsanto argues that Appellees' evidence of an increased risk of harm to human health caused by PCBs was inadmissible and insufficient as a matter of law, because Pennsylvania law sharply circumscribes claims based upon an increased risk of future injury. . . . In this respect, Monsanto cites to cases in which actual damages for increased risk to human health were sought.   As Appellees maintain, however, such decisions have limited relevance to claims predicated on loss or harm to property resulting from chemical contamination, since the problems associated with proving factual causation in bodily-injury cases simply do not arise in this context.

DGS, 898 A.2d at 605 (citing Simmons, 674 A.2d at 232).  Here, the Plaintiffs have dropped their bodily injury claims and are proceeding on a theory that the formaldehyde contamination has harmed their property in that they have lost use of the building and now must remediate the structure.  Therefore, the strict proof on medical causation for formaldehyde exposure that Patriot Timber suggests is largely inapplicable in this context.

To the extent the Plaintiffs do have to prove that the formaldehyde harmed their property by rendering the building unfit for occupancy, they argue that Montz's qualifications are adequate to proffer an opinion on the risks of formaldehyde exposure in enclosed spaces.  When considering the qualification requirement of Rule 702 of the Federal Rules of Evidence, a Court must discern whether a proffered witness has specialized expertise in a given field.  Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).  In undertaking this inquiry, no particular background or credentials are necessary to establish specialized knowledge: "a broad range of knowledge, skills, and training qualify an expert."  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994).  The Third Circuit has interpreted this requirement liberally, both in the substantive and formal qualifications of experts.  Id. (citing Schneider ex rel. Estate of Schneider

v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)).  "It is an abuse of discretion to exclude testimony

simply because the trial court does not deem the proposed expert to be the best qualified or

because the proposed expert does not have the specialization that the court considers most

appropriate." Id. (quoting Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

Montz's qualifications are sufficient to opine on the dangerous effects of formaldehyde

exposure in confined spaces.  Montz earned a Bachelor of Arts in Biology and went on to earn a

Master of Science in Zoology and a Ph.D in Wildlife Sciences with a speciality in environmental

toxicology.  (Doc. No. 63-7, Ex. F.)  While the Defendants frequently point to this educational

background in support of their contentions about Montz's qualifications, the qualifications

inquiry does not end with education.  Montz has authored approximately 45 technical papers and

taught over 80 seminars and training courses on indoor air contamination.  (Doc. No. 75-4, Ex.

2.)  Montz worked for 3 years at the Delaware Department of Health and Social Services

supervising state-wide programs about indoor air quality and health risk assessment, and has

now been president of Indoor Air Solutions for 15 years.  (Id.)  In this capacity, he has consulted

with the legal profession on hundreds of cases involving indoor air contamination.  (Id.)  With

his formal education and experience, Montz has more than enough expertise to satisfy Rule 702

in testifying as to the safety hazard to occupants of a building contaminated by a dangerous

chemical such as formaldehyde, especially given the extensive scientific literature on the subject.

(Id. ¶ 3.)  Given the standard the Plaintiffs need to meet discussed above, the Court finds that

Montz's report is sufficient to create a genuine issue of material fact on this issue and that the

Plaintiffs have made a sufficient showing to establish the existence of this essential element of

their claim.  As such, Defendants are not entitled to summary judgment on this basis.

**F.  Economic Loss Doctrine**

Home Depot argues that the economic loss rule forecloses liability for Plaintiffs' claims for negligence, breach of implied and express warranties, and strict liability.  (Doc. No. 65 at 4.) They claim that the Plaintiffs "have not produced any evidence that any of their other property or their persons were somehow damaged as a result of alleged formaldehyde off-gassing . . . ." and that Plaintiffs' damage claims such as loss of building use are purely economic losses.  (Id. at 8.) Plaintiffs respond that the economic loss doctrine does not bar recovery on these claims:

> First, in the instant action, the damage sustained was to both real and personal property rather than to the product. . . . Second, the Pennsylvania Superior Court has recognized that air inside of a building differs legally from the 'atmosphere' outdoors, implicitly concluding that indoor air is a type of property to which a building's owner might assert an ownership claim. . . . Finally . . . the economic loss doctrine should still not be found controlling under the rationale applied by many courts in asbestos cases: the contamination itself represents harm to other property.

(Doc. No. 74 at 4.)

In Pennsylvania, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract."  Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002).  It operates to foreclose tort causes of action for economic injury unattended by physical injury or damage to real or personal property.  Adams v. Copper Beach Townhome Cmtys., L.P., 816 A.2d 301, 305 (Pa. Super. Ct. 2003).  As such, when the product defect causes damage only to the product itself, there can be no cause of action in negligence or strict liability.  See Nufeeds, Inc. v. Westmin Corp., 2006 WL 1000021, *8 (M.D. Pa. 2006).  The doctrine has been adopted to uphold the important distinctions between the objectives of tort and contractual theories of recovery; "contract theories such as breach of

warranty are specifically aimed at and perfectly suited to providing complete redress in cases

involving . . . economic losses." <u>Werwinski</u>, 286 F.3d at 671 (quoting <u>REM Coal Co. Inc. v.</u>

<u>Clark Equipment Co.</u>, 563 A.2d 128, 133 (Pa. Super. Ct. 1989)).

      Though Plaintiffs argued in their brief that the personal property in their building was

damaged and subject to the "other property" exception, they have withdrawn these claims and

did not press this contention at oral argument on the motion.  (See Doc. No. 172 at 17 n.2.)

Rather, Plaintiffs forcefully argued their second theory—that the air in the building itself was

personal property damaged by the formaldehyde.  Though the Court recognizes that there may be

some merit to Plaintiffs' contention about the internal atmosphere in the building, they have not

presented the Court with sufficient authority to adopt this novel view in the present case.  In fact,

the sole case relied on by the Plaintiffs in support of this theory is <u>Gamble Farm Inn, Inc. v.</u>

<u>Selective Insurance Co.</u>, 656 A.2d 142 (Pa. Super. Ct. 1995), where the court was interpreting

the "pollution exclusion" of a general liability policy.  The court quoted with approval a case

from the Supreme Court of Minnesota which distinguished air inside a building from outside:

"[r]ather within the context of the pollution exclusion, the distinction is not in the air itself but

where the air happens to be.  When the air supply within a building becomes contaminated, it is

harmful to the controlled environment of that building . . . ."  <u>Id.</u> at 508 (quoting <u>Board of</u>

<u>Regents of the University of Minnesota v. Royal Insurance Co.</u>, 517 N.W.2d 888 (Minn. 1994)).

As is clear from the case, however, these courts were exploring the ambiguity in the term

"atmosphere" in the insurance contract at issue, which was pertinent to determine whether the

language would be construed against the insurer.  <u>See id.</u> at 510.  Given these very different

circumstances, the case is clearly distinguishable from the present action.  As such, the Court

22

will not construe the air in the building as personal property and this theory will not save the

Plaintiffs' strict liability and negligence claims against Home Depot.

The Court is similarly not persuaded by the Plaintiffs' arguments that the Court should

declare a public policy exception to the economic loss doctrine for products saturated with

formaldehyde as has been done in asbestos-related contamination cases in other jurisdictions.

The only Pennsylvania case Plaintiffs rely on to support this proposition is Mt. Lebanon School

District v. W.R. Grace And Company, 607 A.2d 756 (Pa. Super. Ct. 1992), which deals with a

public school's claim for damages arising from asbestos containing fire-retardant material that

needed to be remediated.  It is clear, however, that the court in *Mt. Lebanon* relied heavily on the

fact that it was dealing with a public entity owning a public building:

> A number of recent cases in other jurisdictions have rejected the
> argument that a public entity owning a public building cannot sue in
> tort for the costs of removing building materials contaminated with
> asbestos.  The courts have cited a number of factors supporting their
> rulings.  We find two of these factors most persuasive: (1) that the
> school district is a public entity and not a business seeking
> reimbursement for lost profits and (2) that the defect is not in the
> product's failure to perform the function for which it was purchased,
> but rather in its ability to expose the occupants of the building to
> serious health hazards.

Id. at 763 (internal citations omitted).  Neither the Plaintiffs nor the Court's own research have

located any authority to suggest that this court's holding is viable outside of a public-entity

context.  The Steffys' are obviously not a public entity.  Additionally, the Plaintiffs have not

offered sufficient support for their contention that formaldehyde and asbestos are similar enough

contaminants to warrant similar treatment in this regard.

The Court does agree with Plaintiffs that the economic loss doctrine has no applicability

to their claims for breach of implied warranties against Home Depot.  In fact, one of the

foundations for the economic loss doctrine is the availability of warranties to compensate the plaintiff.  See e.g., Werwinksi, 286 F.3d at 671 ("The Court explained that in such a situation express and implied warranties under contract law are best suited to compensate for a loss in product value.")

Accordingly, the Court will grant summary judgment on the Plaintiffs' claims for strict liability and negligence against Home Depot.

### G.  Reliance on Home Depot

Home Depot argues that Plaintiffs' claims for fraud, negligent misrepresentation, implied warranty of merchantability,[3] implied warranty of fitness for a particular purpose, and violation the unfair trade practices and consumer law protection claims fail because Plaintiffs cannot make a sufficient showing that they relied on any representations from Home Depot in paneling the walls of his building with the plywood.  (Doc. No. 65 at 8.)  Home Depot argues that its store clerk, David Mitchell, makes clear that he never even knew that Mr. Steffy intended to use the plywood for wall-paneling:

> Q: Did Mr. Steffy tell you what he intended to do with all this plywood he was buying?  I mean, you had said it was at least 300 sheets and perhaps more, because you said six units, which were either 50 or 64 sheets per unit.
>
> A: I don't recall ever questioning him on the use of plywood.  I just assumed, and solely assumed, that since he was in the concrete business, he might be using it for his company making forms or something of that nature. . . .
>
> Q: So, you have no recollection – are you sure you didn't discuss that, or you just have no recollection one way or the other?

---

[3]  The Court agrees with the Plaintiffs that reliance is not an element of a claim for breach of the implied warranty of merchantability.  See 13 Pa. Cons. Stat. § 2314.

A: I don't believe I did discuss it.

(Mitchell Dep at 21-22.)  Further. Mr. Steffy's deposition seems to confirm Mitchell's

recollection of their meeting:

> Q: Who did you speak with at Home Depot about the plywood paneling?
>
> A: Mr. Mitchell.
>
> Q: And what did he say that convinced you that the plywood paneling would be a good idea?
>
> A: I don't know that he really said anything to convince me of it. We just talked.  I asked him if he could get enough for me to do the building that I wanted to do.  And said he would look into it and get back to me.
>
> Q: When you talked about the building did you specifically tell him that you were going to panel the interior walls of your building with the plywood?
>
> A: I don't know if I told him that or not.  I just told him – I just assumed he would have known that.
>
> Q:  But you don't remember ever saying to him, I'm going to panel my interior walls with plywood?
>
> A:  No.  No, because that's interior plywood.  So that there I wouldn't have bought for exterior because of the different glue that the use in it.
>
> Q:  But you just left that for him to assume.  You didn't tell him?
>
> A:  I left that for him to assume, yep.

(Steffy Dep. at 138-139.)  Plaintiffs argue that Home Depot knew about the warnings on the

MSDS and did not pass them onto the consumer, so it "fraudulently did not inform the

consumer" or at least was "negligent by failing to exercise care and competence in obtaining

information about the plywood." (Doc. No. 74 at 10.) They further argue that the reliance here is "Plaintiffs' reliance on the Home Depot to inform them of potential hazards and non-obvious dangers with the formaldehyde when purchasing the product." (Id.) Additionally, in response to summary judgment, Plaintiffs have filed affidavits by Mr. Steffy and Scott Achey in support of this reliance element. Mr. Steffy's affidavit purports to clarify his deposition testimony:

> During my deposition on November 8, 2007, I was asked whether I specifically told Dave Mitchell, Sales Associate at Home Depot, that I was "going to panel the interior walls of the [building] with the plywood." My response was that I did not recall whether or not I told him that. I do specifically recall telling Mr. Mitchell that I was going to use the plywood as a wall covering and that the building was already constructed and waiting for the wall covering. I therefore assumed that he understood that I was going to use the plywood as an interior wall covering because we were discussing only interior plywood.

(Steffy Decl. ¶¶ 1-4.) Scott Achey asserts that he was present when Mr. Steffy spoke to Mitchell at Home Depot and that Mr. Steffy told Mitchell that he planned to use the plywood as "exposed interior wall board." (Achey Decl. ¶¶ 7-8.) Plaintiffs argue that this evidence presented by the affidavits creates a genuine issue of fact for trial on this issue.

Many of the claims the Plaintiffs' bring against Home Depot require a showing of some form of reliance. In Pennsylvania, the elements of fraud are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994). Similarly, negligent misrepresentation requires justifiable reliance on a misrepresentation of a material fact by the seller. Klages v. General Ordnance Equipment Corp., 367 A.2d 304, 307-08; see also Tran v.

Metropolitan Life Ins. Co., 408 F.3d 130, 136 (3d Cir. 2005).  The implied warranty of fitness

for a particular purpose is set out by 13 Pa. Cons. Stat. § 2315, which provides:

> Where the seller at the time of contracting has reason to know: (1)
> any particular purpose for which the goods are required; and (2) that
> the buyer is relying on the skill or judgment of the seller to select or
> furnish suitable goods; there is . . . an implied warranty that the goods
> shall be fit for such purpose.

See Brantner v. Black & Decker Mfg. Co., 831 F. Supp. 460, 461 (W.D. Pa. 1993) (citing

Altronics of Bethlehem Inc. v. Repco, Inc., 957 F.2d 1102, 1105 (3d Cir. 1992)).  Finally, the

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-3,

also requires a private plaintiff to show justifiable reliance on defendant's wrongful conduct or

representation to assert a claim under the statute.  See Hunt v. United States Tobacco Co., 538

F.3d 217, 224-25 (3d Cir. 2008).  As such, reliance is an essential element in all of these claims.

The Plaintiffs here have failed to make a sufficient showing to support these claims.

Even accepting the affidavits filed in response to summary judgment that Mr. Steffy told

Mitchell he planned to use the plywood as wall covering,[4] the Court finds that the Plaintiffs'

have not pointed to any evidence in the record that shows Home Depot made any representation

about the plywood relied on by the Plaintiffs or that the Plaintiffs relied on the skill and

judgment of Home Depot in buying the plywood to panel the interior walls of their building.

Other than price and stock, there is no evidence that Mitchell made any representation at all to

Mr. Steffy or Scott Achey regarding the plywood.  Mr. Steffy's deposition shows that he made

the decision to purchase plywood for interior wall-paneling based on his own construction

---

[4] At oral argument on this motion, Home Depot raised the issue that Mr. Steffy's affidavit in response to the motion for summary judgment may arguably be a "sham affidavit," but went on to argue that even if the Court accepted the affidavit, these claims based on reliance should still fail.  The Court agrees.

experience and in consultation with Scott Achey:

> Q: Who chose the wood?
>
> A: I did.
>
> Q: Why did you choose it?
>
> A: I was thinking of going with drywall.  And I was in the Home Depot and I don't remember exactly what I was looking at.  And I seen cabinet-grade plywood there.  And I thought, Wow, this would be a lot more sturdier than drywall and take abuse and that.  And then I went and talked to Scott Achey and asked him to go with me in and look at this.  And he said, too, that wouldn't really be any more than drywall to place it. . . .
>
> Q: Did you ask anyone at the Home Depot for an opinion about the use of that plywood for the purpose you wanted to use it for?
>
> A: I don't know that I asked an opinion from them.  We had talked when I was in there and I told them that I was using it for my building.  But I don't know that I asked him what he thought of the idea.
>
> Q: Did you tell him that you were going to use it for finishing interior walls?
>
> A: No.  I just told him that I was going to use it for – I just told him that I was using it on my building. . . .
>
> Q: [After responding "no" to a serious of questions about whether he asked Home Depot sales associates about the qualities of the plywood or instructions on how to use and install the wood:] And you answered no to most of those things because as a construction guy you thought you knew the answer to them; isn't that right?
>
> A: Yes.

(Steffy Dep. at 70-81.)  As this testimony shows, it is clear that Mr. Steffy did not rely on Home

Depot's representations or their skill and judgment in selecting this plywood, but in fact

eschewed any assistance based on his own skill and experience in the trade.  The Plaintiffs seem

28

to concede this point in their brief, arguing instead that Home Depot's failure to pass along information about formaldehyde justifies these claims. (Doc. No. 74 at 10.) The Plaintiffs rely on Al's Café Inc. v. Sanders Ins. Agency, for this proposition, but this case—dealing with insurance brokers—does not alter the above requirements; information must actually be supplied by the defendant and then relied upon. See 820 A.2d 745, 750 (Pa. Super. Ct. 2003). In the face of authority cited above and in Home Depot's brief, the Plaintiffs' argument is unpersuasive. The Court finds that there is no genuine issues of material fact and Home Depot is entitled to judgment as a matter of law on these claims. As such, Home Depot's motion for summary judgment will be granted on Plaintiffs' fraud, negligent misrepresentation, implied warranty of fitness for a particular purpose, and unfair trade practices and consumer protection law claims.

### H. Implied Warranty of Merchantability

Home Depot argues that the "cabinet grade birch plywood that the Plaintiffs purchased may not have been well-suited for use as paneling for every wall in Plaintiffs' 20,000 sq. ft. building, however, the cabinet grade birch plywood was suitable for the purpose for which it was designed—for the construction of cabinets." (Doc. No. 65 at 15.) Home Depot contends that there is nothing in the record to show that cabinet grade birch plywood is appropriately used as wall paneling. The Plaintiffs' counter that the intended use of the product is less than clear because of the lack of instructions or warnings, and that the plywood's description as "cabinet grade" is not controlling on the potential uses of the product.

The implied warranty of merchantability is set forth in 13 Pa. Cons. Stat. § 2314, which provides in pertinent part:

> a warranty that the goods shall be merchantable is implied in a
> contract for their sale if the seller is a merchant with respect to goods

29

of that kind. . . . Goods to be merchantable must be at least such as:
. . . .
(3) are fit for the ordinary purposes for which such goods are used .
. . .

See Gall by Gall v. Allegheny County Health Dept., 555 A.2d 786, 789 (Pa. 1989).  This

warranty does not require that goods are the best quality or the best obtainable but they must

have "an inherent soundness which makes them suitable for the purpose for which they are

designed. . . ."  Phillips v. Cricket Lighters, 883 A.2d 439, 444 (Pa. 2005) (quoting Gall, 555

A.2d at 789-90).

Given the above, it is clear that the determination of the plywood's "ordinary use" is

necessarily similar to the plywood's "intended use."  As the Court determined above, plywood

has many uses and there is little evidence in the record describing the purpose for which this

plywood is designed.  The Court is not persuaded by Home Depot's argument that the term

"cabinet grade" associated with this plywood necessarily forecloses any other use.  Home Depot

refers to its' architectural expert Wheatley for this proposition, but nowhere in his report does he

state that cabinet grade plywood is only used for cabinet making.  In fact, as the Plaintiffs point

out, it is not clear from the record that this plywood is even universally referred to as "cabinet

grade" plywood: invoices between the Defendants for sale of this plywood refer to it as "Paint

Grade."  (Doc. No. 74-6, Ex. 7.)  As discussed above, the plywood itself was structurally suited

to be wall-paneling; it was sturdy and had a finished side suitable as a wall surface.  (See Achey

Decl. ¶ 7.)  Even Home Depot's expert suggests that plywood paneling—albeit exterior-grade—

was suitable at least for the trophy room of the building to accommodate the heavy hunting

trophies.  Accordingly, there is nothing evident about the plywood itself that necessarily renders

paneling a wall an inordinate use of the product.  In any event, the plywood—also referred to as

"interior-grade" plywood at various points— in ordinary use will be exposed to the interior atmosphere of a building.  The Plaintiffs employed it in this way and, as discussed above, there is sufficient evidence to support their theory that formaldehyde offgassing from the plywood into the interior air of their building caused them damages.  As such, the Plaintiffs have made a sufficient showing to establish the existence of this element and the Defendant is not entitled to summary judgment on the implied warranty of merchantability claim.

## III.    DAMAGES

### 1.  Expert Remediation Testimony

Defendants argue that the Plaintiffs have not offered sufficient expert testimony on remediation to allow a "cost of repair" theory to go to the jury.  The Plaintiffs rely on Montz to establish the amount of remediation needed to fix the formaldehyde saturation, who concludes:

> The best option would be a complete removal of all of the paneling and any reservoirs in the building which currently exist. . . . Other less effective and less desirable options are available. . . . These procedures are recognized as not being highly effective. . . .[I]t is our opinion to a reasonable degree of professional certainty, that the best solution from a health standpoint, and without considering cost, complexity, etc., is complete removal of the paneling and all associated sources.  We leave it to others to weigh and evaluate practicality and cost issues since our concern is directed exclusively at protecting the health and minimizing the risk to future occupants in the Steffy building and we leave evaluations of these and other factors to other parties.

(Montz Report at 11.)  Patriot Timber argues that Montz's opinion is inadequate because he expressly fails to consider practicality and cost issues: "[o]nly in the world of armchair amateurs are practicality and cost issues ignored in devising remediation plans."  (Doc. No. 66 at 31.)  The Defendants also argue that Montz is unqualified to opine on the future medical concerns of exposure to formaldehyde exposure to justify remediation.  (Doc. No. 66 at 31.)

Defendants again both rely on Pennsylvania Department of General Services v. United States Mineral Products Co., 898 A.2d 590 (Pa. 2006), where the Pennsylvania Supreme Court held that the necessary remediation response in chemical contamination cases is a subject beyond the general experiences of lay persons and requires expert testimony to inform juror's essential understanding. See DGS, 898 A.2d at 607-08. The plaintiff in DGS sought full-value construction cost damages for the demolished building and alternatively sought remediation damages. The DGS court stated that "those seeking to obtain compensation for property damage [must] establish that the repairs effectuated (or if the claim is of total destruction, the fact of the total loss) are fairly attributable to the defendant's conduct, product, or instrumentality giving rise to the liability." Id. As such, the plaintiff could not recover full-value damages for the subsequently demolished building because the plaintiff failed to "offer expert evidence indicating that remediation of the PCBs in the building to a degree that would make it safe for human occupancy was not possible or practicable (and, correspondingly that the building was a total loss . . . .) " Id. As to the plaintiff's alternative damage theory, however, the expert witness testified to specifications that called for stripping the contaminated building down to its structural steel and stated that the procedures were "necessary to protect human health in the environment." Id. at 609-10. Though the defendant argued this testimony did not sufficiently show that such extreme measures were necessary for reoccupancy of the building, the court found that the testimony was sufficient to show that such remediation measures were necessary. Id.

Here, Montz has determined that stripping out the all the paneling and formaldehyde reservoirs in the building is the best option because other options carry risks to human health for

a foreseeable future time. (Montz Report at 11.) Home Depot argues that "Plaintiffs cannot reject less expensive means for remediating their building, without expert testimony that such means are impracticable." (Doc. No. 65 at 25.) Whether or not this statement is accurate, it does not apply under these circumstances where Montz has considered less radical alternatives and found, in his professional judgment, that they all pose unacceptable risks to occupants of the Steffy building. This is a similar assessment as the approved expert testimony in *DGS*. Montz's report sufficiently establishes that the recommended repairs are fairly attributable to the Defendants' product and necessary for the safety of the occupants. Though it is also contested that such remediation is necessary now since formaldehyde levels in the building have already dropped significantly (Doc. No. 65 at 25), testing shows that the formaldehyde levels are "pulsing" with weather fluctuations and going back above safe levels from time to time. (See Doc. No. 74-4 Ex. 4.) As such, based on the record, a reasonable fact-finder could determine that remediation measures are necessary under these circumstances given the uncertainty of when the formaldehyde will permanently drop below safe levels.

The Court further rejects the Defendants' arguments that Montz is unqualified to opine on the future risks to occupants of the Steffy building in making his recommendation for remediation for the reasons discussed above.

### 2. Remediation Damages in Excess of Market Value[5]

Patriot Timber and Home Depot contend that the Plaintiffs' seek damages beyond what they are entitled by law. "In Pennsylvania, the general measure of damages for permanent harm to real property is the diminution in market value attributable to the conduct, product, or

---

[5] This section is also the subject of a motion in limine. (Doc. No. 92.) For efficiency, the Court will also consider the similar arguments raised in briefing of that motion in this section. (Doc. Nos. 93; 172; 175.)

instrumentality giving rise to liability, and in situations in which the harm is repairable, damages are assessed according to the lesser of the cost of repair or the market value of the affected property.  DGS, 898 A.2d at 596 (citing Lobozzo v. Adam Eidemiller, Inc., 263 A.2d 432, 437 (Pa. 1970)).  Here, there appears to be no dispute that the building is not permanently damaged, so the baseline for damages is the lesser of the cost of repair or the market value of the affected property.

Plaintiffs acknowledge that they are generally limited to the fair market value of a building in recovering remediation damages.  But, relying on DGS, 898 A.2d at 597, Plaintiffs claim that "given the uniqueness of the Building," the full cost of actual construction should be equated to fair market value.  As such, Plaintiffs argue they are entitled to damages in excess of $900,000, as the only measure of damages to make them whole.  (Doc. No. 75 at 15.)

The Pennsylvania Supreme Court has rejected "fixed and formulaic rules when it is determined that they are not setting an appropriate, compensatory standard." DGS, 898 A.2d at 599.  An injured plaintiff should not be deprived of fair recompense merely because there is some degree of uncertainty associated with the calculation of damages.  DGS, 898 A.2d at 597 (citing Smail v. Flock, 180 A.2d 59, 62 (Pa. 1962)).  For this reason, there is a recognized exception to the standard measure of damages in cases of special-purpose property to permit recovery beyond market-value.  See id, at 607.  Special-purpose property is typically property that is extremely difficult to value.  Id. at 597 ("[S]pecial purpose property may not be amendable to conventional market-valuation assessment, and therefore, utilization of some alternate methodology may be appropriate in determining due compensation for associated loss or destruction.")  Special-purpose valuation is not "categorically and immutably" confined to

34

instances in which market valuation is impossible, but may also be used when a building has certain "unique attributes."  Id. at 598 n.6.  In *DGS*, for example, the court found that the Pennsylvania Transportation & Safety Building located on the Capitol campus in Harrisburg could be considered a special-purpose property because of its public functions and the requisite legislative approval before sale.  Id.

The Court does not agree with the Plaintiffs that their building meets the definition of a "special-purpose property" to qualify for a special damage measure.  This building can be valued; Plaintiffs' own appraiser undertook a cost approach analysis of the property and estimated the market value of the contaminated building at $660,000 after considering the necessary depreciation.  (Doc. No. 63 , Ex. U at 62 (hereinafter "Weinstein Report").)  Despite this, Plaintiffs' suggest that any valuation is "inherently suspect" because of the disparity of appraisals from the experts and they contend that they "should be permitted to argue to the jury that, while their appraiser's market valuation of the Building . . . is of some relevance, it should not be viewed as a rigid cap upon an award of repair damages."  (Doc. No. 172 at 2-3.)  The Court disagrees.  Both experts were able to come to a figure of market value for the building, and the Plaintiffs vigorously defended the reliability of those figures for purposes of the *Daubert* motions.  Further, though the special damage category is not completely limited to buildings that cannot be valued, the Steffy building is not similar to the Transportation and Safety Building at issue in *DGS* and does not justify special-purpose valuation.  Therefore, the Court finds that the Plaintiffs will be limited to the lesser of the cost of repair or the market value of the building.

### 3.  Loss of Use Damages[6]

---

[6]  This section is also the subject of a motion in limine.  (Doc. No. 121.)  For efficiency, the Court will also consider the similar arguments raised in briefing of that motion in this section.  (Doc. Nos. 122; 172; 175.)

Plaintiffs intend to claim that as a result of the contamination they suffered damages in the amount of $115,600 due to the loss of use of the building.[7]  (Doc. No. 64-20, Ex. P.)  This value represents the annual rental value of the building.  (Id.)  Neither Defendant argues that loss of use damages are not a recoverable item of property damages as a matter of law, but they contend that loss of use damages are inappropriate in this case because the Plaintiffs admit that they never intended to rent their building and also admit that they have used it for various functions even after the formaldehyde exposure.  (Doc. Nos. 65 at 26; 66 at 15.)  Plaintiffs counter that Defendants have cited no law on their behalf and that the remaining issues are factual contentions that are disputed.

There appears to be a dearth of case-law on loss of use damages to property, as the only case cited by either party on this issue is over a century old.  See Herron v. Jones & Laughlin Company, Limited, 23 Pa. Super. 226, 1903 WL 3186, *3-4 (Pa. Super. Ct. 1903.).  The holding in the case supports the Plaintiffs' position:

> [t]he plaintiff would also be entitled to recover the value of the premises during the period for which he lost its use by reason of the alleged trespass of the defendant, and the expense incident to his removal therefrom . . . . If by reason of the trespass of the defendant his property was rendered uninhabitable, he would be entitled to recover the rental value thereof in addition to the cost of restoration . . . .

Id.  Defendants do not even attempt to distinguish or argue against application of this case, and they provide no authority for their assertion that Plaintiffs must have incurred additional expenses or intended to rent out the space to recover loss of use damages.  While there is evidence in the record that Plaintiffs have continued to make partial use of the building, there is

---

[7]  Originally, Plaintiffs also intended to claim damages resulting from the loss of use of personal property located in the building, but they have withdrawn these claims.  (See Doc. No. 172 at 17 n.2.)

also evidence that the Plaintiffs have not been able to make full use of the building because of

the irritant.  (See Steffy Dep. at 66-69.)  Considering all the evidence in the light most favorable

to the Plaintiffs, the Court finds that there is a genuine issue of material fact on this issue

sufficient to allow presentation of this loss of use damage theory to the jury.  Despite this, the

Court does agree that loss of use damages for the building would have to be limited to the time it

would take to remediate the formaldehyde contamination.  See DGS 898 A.2d at 614.

### 4.  Punitive Damages

Both Defendants challenge the sufficiency of Plaintiffs' evidence with respect to punitive

damages.

Punitive damages are "an extreme remedy available in only the most exceptional

matters."  Phillips v. Cricket Lighters, 883 A.2d 439, 445 (Pa. 2005).  They may be awarded for

outrageous actions that demonstrate willful, wanton, or reckless conduct undertaken due to a

defendant's evil motive or reckless indifference to the rights of others.  Hutchison v. Luddy, 870

A.2d 766, 770 (Pa. 2005) (quoting Feld v. Merriam, 485 A.2d 742, 747 (1984)).  The damages

are appropriately awarded to punish a defendant for this outrageous conduct or to deter the

defendant and others like the defendant from committing such conduct in the future.  Viener v.

Jacobs, 834 A.2d 546, 560 (Pa. Super. Ct. 2003).

The state of mind of the actor pursuing this reprehensible conduct is vital, he must be

acting or failing to act intentionally, recklessly, or maliciously.  Snead v. Soc. for Prevention of

Cruelty to Animals of Pennsylvania, 929 A.2d 1169, 1184 (Pa. Super. Ct. 2007).  A defendant is

reckless when "his conduct creates an unreasonable risk of physical harm to another [and] such

risk is substantially greater than that which is necessary to make his conduct negligent," so a

showing of negligence or even gross negligence is insufficient to establish that punitive damages should be imposed.  Phillips 883 A.3d at 445 (citing Martin v. Johns-Manville Corp., 494 A.2d 1088, 1096 (Pa. 1985)).  Accordingly, punitive damages must be supported by evidence to establish that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk."  Hutchinson, 870 A.2d at 772.

### a.  Home Depot

In support of their claim for punitive damages, Plaintiffs argue that Home Depot's reckless indifference is manifest in the fact that they did not pass along warnings contained in the MSDS sheet to the consumer and also offered the plywood for sale without "any definition of its intended use or directions for its safe use."  (Doc. No. 74 at 21.)  Home Depot argues that the Plaintiffs have "utterly failed to support a finding that Home Depot had a subjective appreciation of the risk of harm to which the Plaintiffs were exposed . . . or that Home Depot acted, or failed to act, in conscious disregard of that risk."  (Doc. No. 65 at 29.)

The Court must agree with Home Depot; punitive damages are reserved for exceptional matters.  The Plaintiffs fail to support their punitive damage claim with any evidence in the record that shows Home Depot created a risk of harm in another that is substantially greater than that which is necessary to make his conduct negligent.  The Plaintiffs' evidence in this regard simply does not show that Home Depot acted with a subjective appreciation of the risk of harm or that they engaged in outrageous conduct such that a jury could reasonably conclude that punitive damages are appropriate.  As such, even considering the evidence in a light most favorable to the Plaintiffs, they are not entitled to punitive damages in this case.  The Court will

grant Home Depot's motion for summary judgment on this issue.

### b. Patriot Timber

The Plaintiffs argue that Patriot Timber's reckless indifference is based on their importation and distribution of a dangerous product. (Doc. No. 75 at 16.) They claim that Patriot Timber imported the plywood without knowledge of the actual manufacturers or the specifications they used in manufacturing the plywood. (Id.) Plaintiffs also complain about the lack of directions or warnings for safe use of the plywood and that Patriot Timber did not test the formaldehyde content in the plywood before placing it into the stream of commerce. (Id. at 17.) Patriot Timber argues that the evidence fails to support any finding that it acted with an evil motive or reckless indifference and that there is no basis here for the jury to award damages. (Doc. No. 66 at 29.)

Even assuming Plaintiffs contentions to be an accurate—Patriot Timber disputes that the record supports Plaintiffs' contentions—punitive damages are unwarranted against Patriot Timber. Just as with Home Depot, the Plaintiffs do not point to sufficient evidence in the record to establish Patriot Timber's subjective appreciation and conscious disregard of the risks of harm that could result from its conduct. The record in this case is simply insufficient to establish that Patriot Timber's conduct was reckless; there is nothing to show Patriot Timber's actions in importing this plywood created an unreasonable risk of physical harm that was substantially greater than that which is necessary to make its conduct negligent. A jury could not reasonably conclude that punitive damages are appropriate under these circumstances, so the Court will grant Patriot Timber's motion for summary judgment on punitive damages.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant in part Home Depot's and Patriot Timber's motions for summary judgment.  An order consistent with this memorandum will follow.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DARREL STEFFY AND | : | |
| SUSANNE STEFFY | : | Case No. 1:06-CV-02227 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| THE HOME DEPOT, INC. AND | : | |
| PATRIOT TIMBER PRODUCTS | : | |
| INTERNATIONAL, INC. | : | |

## ORDER

**AND NOW**, this 31st day of March 2009, upon consideration of the motions for summary judgment by Defendant Patriot Timber Products (Doc. No. 63) and Defendant The Home Depot (Doc. No. 64), filed in the above-captioned matter, and for the reasons set forth in the Court's memorandum opinion filed herewith, **IT IS HEREBY ORDERED THAT** the motions are **GRANTED IN PART** as follows:

1. The following claims against Defendant The Home Depot are **DISMISSED**: strict liability, negligence, breach of implied warranty of fitness for a particular purpose, fraud, negligent misrepresentation, and violation of the Pennsylvania unfair trade practices and consumer protection law.

2. Plaintiffs' claim for punitive damages against both Defendant Patriot Timber Products and Defendant The Home Depot are **DISMISSED**.

3. Remediation damages will be limited to the market value of the building at issue.

4. Loss of use damages for the building will be limited to the time it would take to remediate the formaldehyde contamination.

5. The motions are otherwise **DENIED**.

 S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania